Susan Marie Long, *a minor, et al.*

*v.*

The City Of Weirton, *et al.*

*and*

Manufacturers Heat And Light Co., *a corp.*

(No. 13155)

Decided April 29, 1975.

742

744

*Charles D. Bell, George F. Swearingen, Edward B. Calland, Edward W. Eardley* for appellant Manufacturers Light & Heat Co.

*John Vujnovic, Vujnovic & Ridgway, William J. Ridgway* for City of Weirton.

*James McLaughlin and William W. McVay* for appellees.

*Pinsky, Mahan, Barnes, Watson, Cuomo & Hinerman, John W. Cooper* for Tri-State Asphalt Corp.

*Frankovitch & Anetakis, George J. Anetakis* for White Const. Co.

HADEN, CHIEF JUSTICE:

This is an appeal by Manufacturers Light and Heat Company from a final order of the Circuit Court of Hancock County confirming a judgment entered against it upon a jury verdict in the amount of $216,545.00, but exonerating the City of Weirton as a joint tort-feasor under the same jury verdict on the City's motion for judgment based upon absolution of liability under the "doctrine of governmental immunity."

This action was instituted on behalf of Susan Marie Long, an infant, by her co-guardians against Manufacturers (the "gas company"), the City of Weirton, James White Construction Company and Tri-State Asphalt Corporation for damages resulting from personal injuries suffered by the infant as a result of an explosion and fire which destroyed the home in which she resided. Additionally, special damages were sought by her natural father, Henry A. Long, Jr., her natural mother, Mar-

jorie Long Conley, and her stepfather, Floyd Conley. The jury returned a verdict on October 31, 1969, in the aggregate amount of $216,545.00 against Manufacturers and the City, but did not find specifically either for or against James White Construction Company or Tri-State Asphalt Corporation. Subsequently, judgment was entered on the verdict, against the gas company and the City, but also reflected exoneration of James White Construction Company and Tri-State Asphalt Corporation from any liability to plaintiffs.

Upon proper motions for judgment and a new trial made by appellant and the City, the lower court granted the motion of the City for judgment based upon the "doctrine of governmental immunity," and by the order appealed from denied appellant's motions, thereby allowing the judgment to stand against Manufacturers alone.

The construction company and the asphalt corporation filed in this Court motions to dismiss the appeal against them coincident with the submission of this case for decision. Accordingly, we shall address these motions in the disposition of this appeal.

On April 29, 1963, the City of Weirton was in the process of excavating Liberty Avenue, located in a geographical area of the municipality called King's Creek Bowl, in preparation for future curbing and paving. Although it was the usual previous practice of the City to conduct such excavations by use of its own employees and equipment, on this occasion it had contracted with the James White Construction Company for the use of a forklift with operator at an hourly rate, and with Tri-State Asphalt Corporation for the services of an employee to read "grade-stakes" previously placed by the city engineer. The City Manager, Edward Ewing, and City Street Superintendent, Guy Little, were charged with the direction, control and supervision of the excavation project.

Previous to the commencement of excavation operations at Liberty Avenue, a meeting was had among certain City employees, including Ewing and Little, and

John Marlin, foreman for the gas company, at which Marlin informed the City employees that it was extremely difficult to ascertain the exact depth of gas lines located in the King's Creek Bowl area. Marlin did, however, generally identify and locate gas transmission lines for the City employees and specifically warned them to watch for "regulators" and "reducers" as these would be an indication of where gas service lines crossed the streets in this area. No written or detailed plans were provided the City by Marlin, apparently because such records were nonexistent. According to Marlin, he discussed with the City employees only that portion of Liberty Avenue north of a certain intersecting street, Era Street, and was assured by them that excavation operations would not proceed beyond the Era Street intersection without prior notification to the appellant. Marlin also testified that he proposed to send a utility inspector to locate and identify by "staking" all gas lines in the area after receiving notification by the City that it intended to proceed beyond Era Street.

In the morning hours of April 29, and without prior notification to Manufacturers, the City had proceeded beyond Era Street in its excavation of Liberty Avenue. At approximately 11:00 o'clock a.m., John McGowan, an employee of James White Construction Company, while operating a toothed highlift, struck a line of the gas company at an estimated depth of eight inches below the surface of the roadbed. Contemporaneously with the striking of the line, he heard a "hissing sound." McGowan immediately informed Harold D. Coast, an employee of Tri-State Asphalt Corporation, of the line strike. Coast and McGowan then returned to the site and partially uncovered the line by the use of a shovel. They smelled the odor of gas and determined that the line struck was a service line of Manufacturers. Coast informed a City truck driver of the incident, and the driver, in turn, notified the city manager via the truck's radio that the line had been struck and that gas was leaking. Although the time lapse between the line strike and notification of the city manager was disputed, it

appears that the city manager was informed of the incident within twenty to thirty minutes of the "strike." Immediately upon notification of the gas leak and while remaining in contact with the city truck driver, City Manager Edward Ewing attempted to reach Manufacturers by phone. His first attempt was unsuccessful, but upon his second attempt, and within two minutes of the first, he contacted Robert Stevens, senior shop clerk for Manufacturers, whose duties specifically included the taking of service calls. According to Manufacturers' telephone log records, Stevens received Ewing's call at 11:35 o'clock a.m. Although some dispute exists as to the purport of the conversation between these two men, it appears that Stevens was informed that a gas line had been struck, that there was leaking gas, and that the location of the leak was Liberty Avenue. We note that Ewing, upon being notified, did not attempt contact with the police or fire departments nor did he attempt to warn residents in the area of the gas leak.

Meanwhile, the City employees at the Era Street location returned to the City vehicles where they began their lunch break. Before eating their lunches, McGowan and Coast warned a resident near the site of the line strike, which was almost directly across the street from the Conley residence, that there was a gas leak and that he should shut off his furnace. No notification or warning of any kind was given at the Conley home although testimony at trial established that a child had been seen in the window of the Conley home by the workmen.

Back at the gas company, within a period of approximately five minutes after termination of his conversation with Ewing, Stevens made several unsuccessful attempts by radio to contact Marlin, who at the time was returning from a service call outside the City. Then, having previously ordered his lunch from a nearby restaurant, Stevens informed another office employee, Cucarese, that he was attempting to contact Marlin concerning a gas line strike. No mention was made by

Stevens to Cucarese that a gas "leak" had been reported. Stevens then left the office and walked to the restaurant to pick up his lunch. During this time, Cucarese, on his first attempt, contacted Marlin by radio, inquired as to his location, and asked if he was returning to the office.

Upon his return to the office, Stevens was advised by Cucarese that he had contacted Marlin and that Marlin was returning to the office. Stevens then sat down and began eating his lunch. Although there were several gas company service trucks in the area near King's Creek Bowl, none was contacted. Cucarese stated that had he been informed by Stevens that there was a gas leak he would have gone to the scene himself, but that Stevens did not so inform him and he did not see the Customer's Service Report which reflected the information of the gas leak. Significantly, each of the three mentioned gas company employees—Stevens, Cucarese, and Marlin—acknowledged at trial that the report of a "gas leak" constituted an "emergency situation" calling for immediate remedial action. Marlin stated at trial that had he been notified that there was a gas "leak" by Cucarese, he would have gone directly to the scene, ascertained the origin and type of leak, and evacuated the residents in the immediate area.

Some fifteen to twenty minutes after being contacted by Cucarese, Marlin arrived at the office where he, Cucarese and Stevens briefly talked about the reported gas line strike on Liberty Avenue. At approximately 12:00 o'clock noon, Marlin left for the site. Between 12:05 and 12:10 o'clock p.m. and while en route to Liberty Avenue, Marlin was notified by radio that an explosion had occurred and he continued to the scene of the accident.

Arriving at the then devastated Conley home, Marlin immediately observed that "gas" was burning higher on the left-hand corner of the remaining structure. Closer inspection by Marlin revealed an "unsealed" water line entering the structure at this point. With the assistance of other gas company employees, Marlin cut a section of

the service line to the left side of the house and plugged the main gas line. Simultaneously upon completion of this action the gas fire ceased burning. Shortly afterwards, Marlin, with the use of a backhoe, dug in the area of the gas service line's connection with the main transmission line and discovered that the service line had been pulled loose from the main line allowing gas to leak into the area around the Conley home, and that the main transmission line was within "a couple of feet" of the Conley residence at a depth of three feet.

During trial, the plaintiffs introduced their theory of the cause of the explosion and fire through the expert testimony of Emerson Venable, a consulting chemist and engineer experienced in the prevention of fires and explosions. Five days subsequent to the explosion and fire, Venable examined the site of the incident, devoting particular attention to the remaining structure and the adjacent surroundings. He examined the soil surrounding the structure, determined where utility lines had entered the house, and measured the distance debris had been thrown by the force of the explosion. At trial, Venable was asked for his opinion as to the cause of the explosion and fire, based upon his personal observations at the site and upon a hypothetical question which, in essence, assumed the existence and location of the gas leak, the relative location of the Conley home, the time sequence, the unsealed condition of the water lines entering the Conley home and the observations of Mr. Marlin concerning the location and extinction of the fire. It was Venable's opinion that the cause of the explosion was the ignition of natural gas from the ruptured or parted gas line in front of the Conley residence—specifically, that gas had entered the Conley home from the line break through the porous soil surrounding the point where either the water line or gas line entered the Conley home. He stated that the "hissing sound" heard by the workmen indicated a "high pressure" line which, he opined, would indicate sufficient pressure to force the leaking gas through the ground surrounding the pipe to a location where it probably entered the house through

the unsealed water pipe previously examined by him at the site.

Upon all the evidence adduced, the case was submitted to the jury which returned a verdict in favor of the plaintiffs and against the City and the appellant, apportioning the recovery as follows: (a) In favor of Henry A. Long, Jr., natural father of the infant plaintiff, and against appellant in the amount of $4,511.00; (b) in favor of Marjorie Long Conley, natural mother of the child, and against the appellant in the amount of $12,034.00; and (c) in favor of the infant, Susan Marie Long, and against the City of Weirton in the amount of $200,000.00. The trial court instructed that this verdict was inconsistent and re-submitted the case to the jury for further consideration. The jury's second verdict apportioned the same recovery to the plaintiffs, but against both the City of Weirton and the appellant. Judgment was entered thereon on October 31, 1969, in the gross amount of $216,545.00 against the City of Weirton and the Manufacturers Light and Heat Company.

The petition here contains some thirty-four assignments of error in support of reversal. In the brief submitted on behalf of the appellant, however, the assignments are consolidated into nine "propositions" setting forth the essence of the appellant's contentions. The appellees, in their briefs, have adopted this format. Consequently, in order to effectuate an orderly disposition of this appeal, we have, likewise, adopted the appellant's format and will respond to the propositions in the form presented.

Appellant's first proposition is as follows:

"PLAINTIFFS DID NOT SHOW BY AFFIRMATIVE EVIDENCE THAT THE DEFENDANT MANUFACTURERS LIGHT AND HEAT CO. WAS NEGLIGENT, AND THAT ANY NEGLIGENCE OF MANUFACTURERS LIGHT AND HEAT CO. PROXIMATELY CAUSED THE INJURIES AND DAMAGES COMPLAINED OF."

In support of this proposition, appellant relies primarily upon the cases of *Stenger v. Hope Natural Gas Company*, 141 W. Va. 347, 90 S.E.2d 261 (1955); *Burk v. Huntington Development & Gas Co.*, 133 W. Va. 817, 58 S.E.2d 574 (1950); and *Moore v. Heat & Light Company*, 65 W. Va. 552, 64 S.E. 721 (1909).

On the other hand, the appellees maintain that this action was prosecuted upon the theory of concurrent negligence; that the negligence on the part of both defendants, Manufacturers and the City, conjoined, and proximately caused injury to the plaintiff. Under this theory, these defendants were guilty of concurrent negligence and both were, accordingly, liable for damages or injuries suffered by the plaintiff as a result of such negligent acts. *Hutcherson v. Slate*, 105 W. Va. 184, 142 S.E. 444 (1928); *Lester v. Rose*, 147 W. Va. 575, 130 S.E.2d 80 (1963).

The rule of concurrent negligence is succinctly expressed in *Lester v. Rose, supra*:

> "Where two or more persons are guilty of negligence which occurs in point of time and place, and together proximately cause or contribute to the injuries of another, such persons are guilty of concurrent negligence and recovery may be had against both or all of them." *Syllabus* point 13., *id*. Accord: *Hutcherson v. Slate, supra*.

In *Butler v. Smith's Transfer Corp., etc.*, 147 W. Va. 402, 128 S.E.2d 32 (1962), this Court held:

> "If one tort-feasor is guilty of negligence and another tort-feasor is also guilty of negligence by virtue of acts or omissions which occur in point of time and place after the first tort-feasor's act of negligence, both of which coupled together proximately caused damage or injury to a plaintiff, both tort-feasors would be guilty of concurrent negligence and both would be liable for damage or injury suffered by a plaintiff as a result of such negligent acts." *Syllabus* point 4., *id*.

Both statements accurately reflect the law of this jurisdiction.

We are, of course, mindful of the requirement that before there may be recovery against two or more defendants on the theory of concurrent negligence, it must be shown that the negligent acts of the defendants concurred in point of time and place to proximately cause or contribute to the injury. *Ransom v. Otey,* 144 W. Va. 810, 111 S.E.2d 21 (1959); *Walker v. Robertson,* 141 W. Va. 563, 91 S.E.2d 468 (1956); *Hartley v. Crede,* 140 W. Va. 133, 82 S.E.2d 672 (1954); *Roush v. Johnson,* 139 W. Va. 607, 80 S.E.2d 857 (1954); *Tawney v. Kirkhart,* 130 W. Va. 550, 44 S.E.2d 634 (1947); *Miller v. Douglas,* 121 W. Va. 638, 5 S.E.2d 799 (1939).

Appellant readily ascribes to there being ample evidence of actionable negligence on the part of the City of Weirton, but contends that the plaintiffs failed to sustain the burden of showing any act or omission by appellant constituting negligence, and failed to show that any act or omission of the gas company was the proximate cause of the injuries to the infant plaintiff. In view of this contention, it appears that a comprehendible disposition of the first proposition logically requires antecedental consideration of the appellant's third proposition which is in the following language:

"THE MANUFACTURERS LIGHT AND HEAT COMPANY IS CHARGEABLE WITH REASONABLE RESPONSE AFTER NOTICE IS GIVEN OF THE STRIKING OF A GAS LINE AND THE MANUFACTURERS LIGHT AND HEAT COMPANY DID, IN FACT RESPOND REASONABLY. IT IS NOT CHARGEABLE WITH PERFECT RESPONSE."

Appellant contends that because of the relatively short interval of time between the notice of the striking of the gas line, the resulting leak, and the accident, the trial court improperly "permitted the jury to infer from a presumption" that the appellant could have responded earlier and prevented the injury. Appellant further con-

tends that it was not shown how it could have prevented the accident causing the injuries complained of had it responded with greater alacrity.

Were it not for the concurring acts of negligence by the other persons in this case, it might well be that the independent acts of the gas company would not have constituted reasonable basis for the inference and/or presumption alluded to. Indeed, were it not for the line striking, the accident or injury would not have occurred at all. Nevertheless, upon all the evidence in this case, the jury inferentially concluded that there was unreasonable delay by the gas company either in shutting off the leak or in causing those in the proximity of the leak to be warned of the danger, or both. While the interval of time between notice to appellant of the gas leak and its response thereto was relatively brief, we believe that the jury's determination, that the company's failure to respond swiftly to the emergency during such interval constituted actionable negligence, was warranted in view of the relatively high pressure in the gas line, the highly volatile nature of the escaping gas, the close proximity of the houses to the leak, and the company's acknowledged policy to respond promptly to "emergency situations."

Appropriate and immediate response to gas leaks is necessary where one is charged with controlling substances of "dangerous character." As is noted in *Groff v. Charleston-Dunbar Natural Gas Co.*, 110 W. Va. 54, 156 S.E. 881 (1931), quoting from *Siebrecht v. Gas Co.*, 47 N.Y.S. 262, 263:

> "Care and prudence required of the defendant watchfulness and vigilance commensurate with the dangerous character of the substance it was distributing, and this involves not only the careful laying of sound pipes, but also requires an efficient system of inspection, oversight and superintendence." *Id.* at 58.

*See also, Richmond v. Atlantic Company*, 273 F.2d 902 (4th Cir. 1960); *Public Service Co. v. Dalbey*, 119 Ind.App.

405, 85 N.E.2d 368 (1949); and *Feely v. National Packing Co.*, 141 La. 903, 75 So. 837 (1917).

The jury's determination of the matters involved in appellant's proposition No. 3 turned, in large measure, upon its resolution of the factual conflicts in the evidence, and more importantly, the reasonable inferences arising upon such facts. We therefore deem it appropriate to note here the cardinal rule that it is the peculiar and exclusive province of the jury to weigh the evidence and to resolve questions of fact when the testimony is conflicting. *See, Abdulla v. Pittsburgh and Weirton Bus Co.*, ____ W. Va. ____, 213 S.E.2d 810 (1975); *Wager v. Sine*, ____ W. Va. ____, 201 S.E.2d 260 (1973); *Yeager v. Stevenson*, ____ W. Va. ____, 180 S.E.2d 214, 216 (1971); *Poe v. Pittman*, 150 W. Va. 179, 144 S.E.2d 671 (1965). Moreover, "[i]n determining whether the verdict of a jury is supported by the evidence, every reasonable and legitimate inference, fairly arising from the evidence in favor of the party for whom the verdict was returned, must be considered, and those facts, which the jury might properly find under the evidence, must be assumed as true." *Syllabus* point 3., *Walker v. Monongahela Power Company*, 147 W. Va. 825, 131 S.E.2d 736 (1963). Accord: *Weirton Savings and Loan Company v. Cortez*, ____ W. Va. ____, 203 S.E.2d 468 (1974). It is the function of this Court to determine whether or not the verdict is supported by credible evidence, not to reevaluate the evidence. In that context, the facts regarding the appellant's delay in responding to notice of the gas leak were rather extensively developed, and upon such facts, the jury apparently concluded that appellant's inordinate delay constituted actionable negligence which, when combined with the negligence of the City, proximately caused or resulted in the injury complained of. We, therefore, see no indication that this verdict necessarily involved an inference based upon a presumption or vice versa.

For the foregoing reasons, we find no error in the jury's verdict insofar as it involved a consideration of the reasonableness of the reponse by appellant upon

notification of the gas leak. Accordingly we find no merit in appellant's Proposition No. 3.

Having determined that the evidence in this case warranted the jury's finding of negligence on the part of the appellant, we give further consideration to the question of proximate cause raised in appellant's first contention. The inescapable requirement of proving proximate cause in negligence cases has been acknowledged, *supra*. That negligence alone is insufficient to warrant recovery is equally established. *Jones v. Smithson*, 119 W. Va. 389, 193 S.E. 802 (1937); *Jones v. Virginian Ry. Co.*, 115 W. Va. 665, 177 S.E. 621 (1934); *Schwartz v. Shull*, 45 W. Va 405, 31 S.E. 914 (1898); *Butcher v. West Virginia & P. R. Co.*, 37 W. Va. 180, 16 S.E. 457 (1892). Briefly summarized, the negligence charged must be one of the efficient causes of the injury.

Recognition of the foregoing principles does not, however, in the concurrent negligence context, require precise proof that the separate acts of negligence of the defendants each constitute, independently, the efficient cause of the injury. To illustrate, this Court affirmed a judgment against two defendants for their concurrent acts of negligence resulting in the death of the plaintiff's decedent in the case of *Roush v. Johnson*, 139 W. Va. 607, 80 S.E.2d 857 (1954). The evidence there, although extremely complex and conflicting, revealed that one of the defendants had improperly installed an electrical switch box while the other improperly outfitted the box for use. In referring to such separate and distinct acts of negligence as concurring to produce the injury, this Court said at pages 630-31:

"Though this Court, in dealing with the question whether an alleged act of negligence is the sole proximate cause of the alleged wrongful death or injury complained of, has held that the proximate cause of an injury is the last negligent act contributing thereto without which such injury would not have occurred, *Schwartz v. Shull*, 45 W. Va. 405, 31 S.E. 914; *Divita v. Atlantic Trucking Co.*, 129 W. Va. 267, 40 S.E.2d 324, it is

settled in this jurisdiction that where the alleged injury or wrongful death results from the concurrent negligence of two or more persons, though acting independently of each other, which combined resulted in the injury to or death of a third person, recovery may be had against either or all. *Starcher v. South Penn Oil Co.*, 81 W. Va. 587, 95 S.E. 28; *Day v. Louisville Coal & Coke Co.*, 60 W. Va. 27, 53 S.E. 776. And, more specifically, 'Where separate and distinct negligent acts of two or more persons continue unbroken to the instant of an injury, contributing directly and immediately thereto and constituting the efficient cause thereof, such acts constitute the sole proximate cause of the injury.' Pt. 1 syl., *Brewer v. Appalachian Constructors, Inc.*, 135 W. Va. 739, 65 S.E.2d 87. Accordant: *American Telephone & Telegraph Co. v. Ohio Valley Sand Co.*, 131 W. Va. 736, 50 S.E.2d 884; *Tawney v. Kirkhart*, 130 W. Va. 550, 44 S.E.2d 634; *Gilkerson v. Baltimore and Ohio Railroad Co.*, 129 W.Va. 649, 41 S.E.2d 188; *Sigmon v. Mundy*, 125 W. Va. 591, 25 S.E.2d 636. See generally 65 C. J., Negligence, Section 110, and Restatement of Torts, Section 882."

This Court concluded that the jury properly determined that the respective installations made by the two defendants were negligent acts which, "though separate and distinct in themselves, continued by an unbroken sequence to the point of decedent's death, . . . ." *Id.* at 633.

In *Brewer v. Appalachian Constructors, Inc.*, 135 W. Va. 739, 65 S.E.2d 87 (1951), the following rule was quoted with apparent approval:

" 'The negligence of the defendant need not be the sole cause of the injury, it being sufficient that it was one of the efficient causes thereof, without which the injury would not have resulted; but it must appear that the negligence of the person sought to be charged was responsible for at least one of the causes resulting in the injury.' 65 C.J.S., Negligence, Section 110." *Id.* at 744.

Applying the foregoing principles in the instant case, the plaintiffs were not required to show that appellant's negligence was the sole proximate cause of the injury. Rather, they were required to show only that the appellant was negligent, that such negligence concurred with that of the City, and that such combined acts of negligence continued unbroken to the instant of the injury, contributing directly and immediately thereto, and constituted the efficient cause thereof. This apparently was accomplished to the satisfaction of the jury by the plaintiffs' evidence.

The appellant, as noted, relies upon *Stenger v. Hope Natural Gas Company, supra.* Although the opinion in that case discusses certain issues somewhat related to the issues *sub judice,* the primary basis of liability in that case involved the utility's alleged negligence in failing to use reasonable diligence in the inspection and maintenance of its gas line. The opinion therein notes that although the defendant's predecessor knew of the defective condition of a particular gate valve, there was no showing that the defendant "received any report relative to the condition of such valve." The instant case involves not a question of diligence in the discovery of a leak, but rather, the diligence in responding to notice of a leak. The *Stenger* case is, therefore, inapposite here.

The decision in *Moore v. West Virginia Heat & Light Co., supra,* is, likewise, not in point. That case involved a factual situation in which this Court determined that, as a matter of law, the evidence failed to show that the fire originated from returning gas after gas service had been interrupted temporarily by the utility. Without attempting to restate the numerous reasons given by the Court for the plaintiff's failure of proof, suffice it to note a portion of the opinion quoted in the appellant's brief:

> "It is clear that the fire started in the garret; but how no one knows. . . . The plaintiff's theory is that the gas passed into the burner in that stove and went up pipe and flue. How did it ignite if so? His counsel would say that there was a latent spark in burner or pipe or flue and when

the gas went into them, one or another, ignition occurred. . . . Unless we adopt this theory (only theory) there is absolute no ground for the claim that the fire came from returning gas. . . . It is all surmised. We are asked to build up this theory for charge on mere surmise, mere possibility; . . ." *Id.* at 554-55.

A factual comparison of the *Moore* case with the instant case is likewise as unproductive as the *Stenger* decision. In the instant case, the known existence of the leak, the pressure in the line, the time sequence involved, the proximity of the plaintiff's home to the leak, and other testimony, logically attributing the explosion and fire to such leak, lend compelling support to the jury's finding of causation.

In *Burk v. Huntington Development & Gas Co., supra,* this Court reversed a judgment against the gas company because the evidence failed to establish the defendant's negligence by a preponderance of the evidence. The only evidence there indicating the presence of gas near the house where the explosion occurred was testimony to the effect that, on the evening following the explosion and on the following two or three days, some person, representing himself to be a gas company employee, made an examination around the destroyed dwelling in an effort to detect natural gas; that a gauge used by the "employee" revealed gas in the ground where the service line was located; and that there was gas in the ground in the area in which the explosion occurred. Because of the lack of any evidence establishing the location of the negligent agency which proximately caused the explosion—that is, the location and responsibility for the leak—, this Court held that the jury was not justified in assessing responsibility against the defendant. In the instant case, however, the location of and responsibility for the leak was readily apparent and undisputed. The *Burk* case is likewise not in point.

The *Burk* case is also cited by appellant for the proposition that causation must be established by a preponderance of the evidence. We agree. Appellant also sug-

gests that causation must be shown to a "reasonable certainty", noting the following language of *Sims v. Bank of Charleston*, 8 W. Va. 274, 280, quoted in *Burk v. Huntington Development & Gas Co.*, *supra*:

> "Evidence offered to establish an alleged debt should do more than produce a suspicion of the fact—it should be sufficiently clear and definite in its character to satisfy the mind of the court of the fact, to a reasonable certainty." *Id.* at 831.

While the foregoing proposition has been employed in at least four subsequent decisions of this Court: *Legg v. Junior Mercantile Company*, 105 W. Va. 287, 142 S.E. 259 (1928); *Antonowich v. Home Life Insurance Company*, 116 W. Va. 155, 179 S.E. 601 (1935); *Burk v. Huntington Development & Gas Co.*, *supra*; *Moore v. West Virginia Heat & Light Co.*, *supra*, it should not be observed to require proof of negligence to a reasonable certainty. The required burden of proof is accurately stated in the third *syllabus* point in the *Burk* case, to-wit:

> "In an action at law tried before a jury, the burden rests upon the plaintiff to establish his case by *a preponderance of the evidence*; and if all the evidence in the case fails to establish his claim by a preponderance of the evidence, the verdict should be for the defendant." (Emphasis supplied).

The evidence in this case warranted a conclusion that the plaintiff's injury resulted from the concurrent negligence of the appellant and the City and that such acts of negligence, although independent in origin, ultimately combined and thereafter continued unbroken to the instant of injury, contributing directly and immediately to the injury and constituted the efficient cause thereof. The assignments embodied in appellant's proposition *one* are, therefore, without merit.

Appellant's Proposition No. 2 is as follows:

"WHERE THE PLAINTIFF DOES NOT SHOW BY A PREPONDERANCE OF THE EVIDENCE

THE ·CAUSE OF THE EXPLOSION, THE PLAINTIFF MAY NOT RECOVER DAMAGES, AND EXPERT EVIDENCE BASED ON AN ERRONEOUS HYPOTHETICAL WILL NOT SUFFICE TO MEET THE BURDEN."

As with appellant's first proposition, this assignment is more properly considered in conjunction with the third proposition. Once again, the factual conflicts were highly significant in determining whether, in the first instance, the plaintiff's evidence preponderated in favor of a finding that the cause of the explosion could be traced to the gas leak. Accordingly, we make more elaborate reference to the evidence revealing a *break* in the gas line, the proximity thereof to the plaintiff's dwelling, the testimony concerning the direction in which the gas might be reasonably expected to flow, the time sequence and other circumstances cumulatively indicating the probable cause of the explosion and fire. In this regard, the witness Marlin testified that he observed the greatest concentration of burning gas at that portion of the foundation where an unsealed water line entered the foundation of the house. He also said, as noted, that when the gas was finally turned off in the main line, the flame at the corner of the house was snuffed out immediately. Considering all of these facts to be established, in view of the jury's verdict, we believe that the evidence clearly warranted a finding that the explosion was traceable to the gas leak in question. Not only is such a finding warranted, it is, in our view, forcefully compelled by the evidence.

Appellant's specific objection to the continuity of evidence concerning tracing of gas from the broken pipe into the Conley house was that the foundation of the house was not examined at the entrance point of the water line to determine whether its condition, like that on the inside, was unsealed. For this same reason, appellant complains of the hypothetical question to Mr. Venable as being based upon an unwarranted assumption that the water lines leading to the plaintiff's home were unsealed.

Recognition of the rule requiring proof of causation does not impose upon the plaintiff a duty to exclude every other plausible theory as to the cause and effect of the accident. In determining causation, the logical sequence of cause and effect may appear notwithstanding certain omitted facts. What has been termed a "classic definition of causation may be found in the case of City of *Bessemer v. Clowdus*, 261 Ala. 388, 394, 74 So.2d 259, 263 (1954):

> "As a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference. There may be two or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any one of them, they remain conjectures only. On the other hand, if there is evidence which points to any one theory of causation, indicating a logical sequence of cause and effect, then there is a juridical basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence."

We believe the above quoted test-definition correctly differentiates between mere conjecture and what is properly deducible as fact.

The facts adduced in this case, we believe, clearly warranted a finding that the evidence preponderated in favor of the explanation that the logical sequence of cause and effect was that the escaping gas entered the dwelling through the soil surrounding the utility lines, as opined by Mr. Venable in response to the hypothetical question. The condition of the foundation wall on the "outside" of the house, not having been directly ascertained by any party, was simply a matter affecting the weight of the evidence concerning the alleged entry of the gas into the Conley home; it was not an essential link in the plaintiff's chain of proof.

Witness Marlin, in describing the scene of the accident upon his arrival, said: "This foundation, this water line

was not sealed." This statement, notwithstanding the fact that the line was apparently not examined from the outside to determine whether or not it was sealed at the point of entry, furnished a competent evidentiary foundation and a sufficient basis for the assumption contained in the hypothetical question. Again, plaintiffs' failure to exhaust every possibility concerning causation merely goes to the weight of the testimony and not to its competency.

It is generally recognized that:

"[C]ounsel is not confined to the positive and direct testimony in the case in framing a hypothetical question. Rational inferences that may be drawn from the testimony, as well as the positive and direct testimony itself, may form the basis for the question. The interrogator may frame his question on any theory which can reasonably be deduced from the evidence and select as a predicate therefor such facts as the evidence proves or reasonably tends to establish or justify." 31 Am. Jur. 2d, *Expert and Opinion Evidence* § 56 (1967).

This Court has applied the rule embodied in the foregoing statement in both criminal and civil cases. *See, State v. Evans,* 136 W. Va. 1, 8, 66 S.E.2d 545, 549 (1951); *State v. Lewis,* 133 W. Va. 584, 598, 57 S.E.2d 513, 523 (1949); *Byrd v. Virginian Railway Company,* 123 W. Va. 47, 13 S.E.2d 273 (1941); *Fairview Fruit Co. v. Brydon & Brother,* 85 W. Va. 609, 102 S.E. 231 (1920); *State v. Angelina,* 73 W. Va. 146, 80 S.E. 141 (1913); *State v. Cook,* 69 W. Va. 717, 72 S.E. 1025 (1911); *Bowen v. City of Huntington,* 35 W. Va. 682, 14 S.E. 217 (1891); *Kerr v. Lunsford,* 31 W. Va. 659, 8 S.E. 493 (1888). The assignments embodied in appellant's *second* proposition are without merit.

Appellant's Proposition No. 4 is as follows:

"WITH RESPECT TO THE DOCTRINE OF MUNICIPAL IMMUNITY, DEFENDANT ARGUES THAT THE DOCTRINE SHOULD BE ABOLISHED, BUT THAT WHETHER OR NOT IT IS

ABOLISHED, THE CITY OF WEIRTON IN THE INSTANT CASE IS NOT ENTITLED TO THE BENEFIT OF THE DOCTRINE, AND HAS WAIVED THE BENEFITS OF THE DOCTRINE."

Upon motion for directed verdict made and reserved during trial, and subsequent motion to set aside the verdict and judgment against the City of Weirton as a joint-feasor with the gas company, the trial court entered judgment for the City. In so doing, the court determined, as a matter of law, the doctrine of "governmental immunity" inured to the benefit of the City and held, further, that "Chapter 17, Article 10, Section 17 of the West Virginia Code when it refers to 'users of a street or roadway by day or night' does not contemplate or portend to cover the instant type of situation."

Putting aside for the moment our impending encounter with the doctrine of governmental immunity, we wish to note initially our concurrence with the opinion of the trial court that *W. Va. Code* 1931, 17-10-17, as amended, does not furnish legal basis for holding the City of Weirton liable to Susan Marie Long. Until very recently, that statute imposed absolute liability upon counties and municipalities for injuries sustained by reason of any street, sidewalk or alley being out of repair. See *W. Va. Code* 1931, 17-10-17, as amended (1969); *Miller v. City of Morgantown,* ____ W. Va. ____, 208 S.E.2d 780, 782 (1974).

The case of *Watkins v. County Court,* 30 W. Va. 657, 659, 5 S.E. 654, 655 (1888) indicates that this statutory obligation "has always been in force in this State." Certainly, since 1868, the statute has placed an affirmative duty upon counties and municipalities to keep its streets and roadways in repair, and has made those bodies absolutely liable to injured persons for the counties' or cities' failure to observe the duty of repair. *W. Va. Code* 1868, Ch. 43, § 55; *Griffin v. Town of Williamstown,* 6 W. Va. 312 (1873). A city's liability for failure to observe the statute which results in an injury has been construed to

run in favor of users of a street or roadway by day or night. *Wilson v. City of Wheeling*, 19 W. Va. 323 (1882); *Holsberry v. City of Elkins*, 86 W. Va. 487, 103 S.E. 271 (1920). According to these and numerous more recent authorities, Susan Marie Long, a non-user of the street in the context of this case, is not a member of the class protected by the statute, and for that reason alone, could not, *as she did not*, assert liability successfully against the City pursuant to this statute.

Historically, and customarily, this statute has been applied favorably to an injured party only in instances of nonfeasance, that is, where the municipality allowed the street or roadway to become "out of repair" by reason of its failure to act, rather than by its affirmative misdeeds. *Burcham v. City of Mullens*, 139 W. Va. 399, 83 S.E.2d 505 (1954); *Burdick v. City of Huntington*, 133 W. Va. 724, 57 S.E.2d 885 (1950); *Taylor v. City of Huntington*, 126 W. Va. 732, 30 S.E.2d 14 (1944); *Carder v. City of Clarksburg*, 100 W. Va. 605, 131 S.E. 349 (1926). On the assumption that the common law did not require a county or a municipality to build a road or to maintain the road after it was built because such power was purely discretionary with the governmental body, members of this Court in its earliest years concluded that the Legislature imposed an absolute duty upon those governmental bodies to maintain roadways and streets so as to insure that travelers thereon would not be injured if such were allowed to become "out of repair." See, *Wilson v. City of Wheeling, supra; Gillison v. City of Charleston*, 16 W. Va. 282 (1880); *Mendel & Co. v. City of Wheeling*, 28 W. Va. 233 (1886).

Nevertheless, it is significant to our resolution of the issue of governmental immunity that these courts also recognized that the liability of a municipal corporation for misfeasance, as distinguished from nonfeasance, antedates statutory liability. Deferring extensive discussion at this juncture, it is to be further noted that this proposition received recognition and application as respects injuries proximately resulting from the misfea-

sance of a municipality or its agents in the construction and maintenance of "works of improvement" including roadways and streets. See, *Gillison v. City of Charleston, supra,* at 303 of the West Virginia Report; *Mendel & Co. v. City of Wheeling, supra,* at 257 of the West Virginia Report; see particularly, *Wilson v. City of Wheeling, supra,* at 334 of the West Virginia Report where Judge Alpheus F. Haymond noted that, in addition to the statutory liability imposed by the predecessor to *W. Va. Code* 1931, 17-10-17, as amended, the "general accepted law" in this Country and in this jurisdiction was:

> "[W]hen the city undertakes the improvement of a street by grading or otherwise, the authorities are bound to take care what they cause to be done shall not endanger the safety of the public. The city is in all cases responsible for such dangers as are incident to, and consequent upon the nature of the work itself; . . . ."

In the instant case, the negligence of the City, as alleged by plaintiffs and found by the jury, occurred in the act of preparing the street for future curbing and paving, an affirmative act of negligence or misfeasance. For this obvious reason, we also concur the statute does not impose liability in favor of Susan Marie Long against the City of Weirton.

Returning to the trial court's ruling exonerating the City of Weirton from liability to the appellees, we must inquire: What is the origin for the supposition that a municipality is immune from liability for its torts?

Although there is extensive, but questionable, authority to the contrary, this Court recently dispelled the notion that a city is entitled to avail itself of the sovereign immunity of the State of West Virginia as is provided in *W. Va. Const.,* art VI, § 35:

> "Article VI, Section 35 of the Constitution of West Virginia which provides that the state shall never be made a defendant in any court of law or equity does not apply to a municipality and does

not afford such municipality any protection from suit." *Syllabus* point 4, *Higginbotham v. City of Charleston*, ___ W. Va. ___, 204 S.E.2d 1 (1974).

Thus, this Court tersely and unequivocally rejected the constitutional immunity granted to the sovereign State as being applicable to municipal corporations. In so holding, the *Higginbotham* decision implicitly overruled the previously decided cases of *Hayes v. Cedar Grove*, 128 W. Va. 590, 37 S.E.2d 450 (1946); *Hayes v. Cedar Grove*, 126 W. Va. 828, 30 S.E.2d 726 (1944); and *Brown's Adm'r v. Guyandotte*, 34 W. Va. 299, 12 S.E. 707 (1890), all of which applied the State's absolute immunity from suit for the benefit of a municipal corporation while it was engaged in the performance of a governmental activity on the theory "the state delegates a portion of its sovereignty to be exercised within particular portions of territory for certain well-defined public purposes." *Brown's Adm'r v. Guyandotte, id.*

In view of the foregoing discussion, we proceed on the premise that the defense of sovereign immunity, saved unto the State by Article VI, Section 35 of the Constitution, is not available to the City of Weirton. Nevertheless, the concept of governmental immunity had its genesis in the common law and, therefore, may have been engrafted into the jurisprudence of this State through the adoption of Article XI, Section 8 of the West Virginia Constitution of 1863 which provided:

> "Such parts of the common law and of the laws of the State of Virginia as are in force within the boundaries of the State of West Virginia when this Constitution goes into operation, and are not repugnant thereto, shall be and continue the law of this State until altered or repealed by the Legislature. . . ."

More pointedly, the modern statutory companion to the foregoing constitutional provision, provides as follows:

> "The common law of England, so far as it is not repugnant to the principles of the Constitution of this State, shall continue in force within

the same, except in those respects wherein it was altered by the general assembly of Virginia before the twentieth day of June, eighteen hundred and sixty-three, or has been, or shall be, altered by the legislature of this State." *W. Va. Code* 1931, 2-1-1, as amended.

Consequently, if the common law of England or the laws of the Commonwealth of Virginia prior to June 20, 1863, have been recognized and applied as having extended a general grant of immunity to municipalities from tort litigation, the constitutional and statutory inhibition against judicial abrogation of such doctrine would appear to present this Court with a formidable obstacle to declare otherwise.

Initially, we must recognize this Court held quite recently:

"At common law, a municipal corporation is not liable for personal injuries or property damage caused by the negligence of its officers or agents in the discharge of, or omission to discharge, duties which are purely governmental in character. The maintenance of a public street by a municipality constitutes the performance of a governmental function." *Syllabus* point 2., *Jones v. City of Mannington,* 148 W. Va. 583, 136 S.E.2d 882 (1964).

If the foregoing statement is merely a decision of this Court based upon a mistaken understanding of the common law incorporated into West Virginia jurisprudence, it, like any other decision, is subject to reconsideration and if found to be wrong, may be overruled and excised from the body of decisional law. On the other hand, if that case represents an accurate rendition of the common law in force in the Commonwealth of Virginia, and consequently operable and binding within the boundaries of this State prior to June 20, 1863, change from its provisions should come from the Legislature and not from this Court. See, *Hayes v. Cedar Grove, supra;* student notes: 76 W. Va. L.Rev. 543, 563 (1974); 71 W. Va. L.Rev. 341 (1969).

Some writers assume that the origin of the doctrine of governmental immunity is a direct outgrowth of the supposed "divine right of the King" who could do no wrong. As noted, that theory, regardless of its validity, has no application in this case by reason of the *Higginbotham* decision, *supra*. Such "divinity" as is reposed in the State of West Virginia by the grant of immunity found in our Constitution is not transferrable to a municipal corporation.

Insofar as municipal communities are concerned, it is generally agreed that the governmental immunity doctrine as it applied, or applies, to the tort liability of municipalities had its genesis in the decision of *Russell v. Men of Devon*, 2 T.R. 667, 100 Eng.Rpts. 359 (1788). See, Borchard, *Governmental Liability in Tort*, 34 Yale L.J. 1, 129, 229, *et seq.* (1924). In 57 Am. Jur. 2d, *Municipal, etc. Tort Liability* § 28 (1971), it is said:

> "The decision in an early English case [*Russell v. Men of Devon, supra*] established the principle of the common law that an individual could not maintain an action against a political subdivision of the state for injury resulting from negligence in the performance of any governmental function. . . ."

In the *Russell* case, the court dismissed an action brought at the instance of a private individual who claimed damages to his wagon caused by a bridge being out of repair due to the neglect of county inhabitants. A superficial reading of the case might indicate the oft-assumed conclusion that a citizen injured through the negligence of a public body would have no recourse. A close examination, however, reveals quite a different rationale for decision. In refusing recovery, the defendants' position was summarized:

> "[T]he defendants are the men of Devon, who must be taken to mean the inhabitants of that county at the time of purchasing the writ: *but the inhabitants of a county* are a fluctuating body, and before judgment obtained, other per-

sons may have come to reside in the county, when the whole damages may be levied on such innocent persons ..." (Emphasis supplied). 100 Eng.Rpts. at 360.

Significantly, the defendants were characterized as mere individuals, unorganized as a public body and un-incorporated. Moreover, because there was no such official body, the court found no treasury, public or otherwise, from which a judgment could be satisfied. Although the court felt, additionally, that recovery would give rise to a multiplicity of actions, it did not imply that recovery would be denied in any case involving a public body defendant. Again noting defendants' position, the court said:

"[All civil suits] must either be brought against individuals, who are to be particularly named, or against corporations, .... This mode of bringing actions against large bodies of men would render nugatory the privileges of the Crown of creating corporations, and would destroy the mode of suing corporations in their corporate capacity." *Id.* at 360.

From this language it seems apparent that the court might have reached a different conclusion had the men of Devon been incorporated. Lord Kenyon pointedly noted "[T]he question here is, whether this body of men, who are sued in the present action, *are a corporation ...* against whom such an action can be maintained." (Emphasis supplied). *Id.* at 362. And, as demonstrated in the court's summary of argument, the contentions put forth were premised on the proposition that: "If any individual, or a corporation, ought to have repaired this bridge, there can be no doubt that the action would have lain." *Id.* at 361.

Further indication that the *Men of Devon* decision did not intend to bestow immunity to incorporated public bodies can be found in *The Mayor and Burgesses of Lyme Regis v. Henley*, 3 B & AD 77, 110 Eng.Rpts. 29 (1832) [affirming Court of Common Pleas (5 Bing. 91); affirmed, House of Lords, 2 Cl. & F. 331, 6 Eng.Rpts.

1180 (1834)]. There, Henley brought an action against the officials of the incorporated town of Lyme Regis for the non-repair of sea walls, resulting in property damage to the plaintiff caused by water inundation. In affirming the Court of Common Pleas, the Court of King's Bench held that "the *corporation* ... bound themselves to do those repairs." (Emphasis supplied). 110 Eng.Rpts. at 34. Specifically:

> "[T]he obligation to repair the banks and sea shores is one which concerns the public, in consequence of which an indictment might have been maintained against the plaintiffs in error [Mayor and Burgesses] for their general default; from whence it follows that an action on the case will lie against them for a direct and particular damage sustained by an individual, as in the ordinary case of nuisance in a highway by a stranger digging a trench...." *Id.* at 35.

The *Lyme Regis* decision specifically noted the distinction made in the *Men of Devon* case:

> "In *Russell v. The Men of Devon* (2 T.R. 667), it seems to have been admitted that the action, which was there brought against the inhabitants of a county for an injury sustained in consequence of a county bridge being out of repair, would have been maintainable against a corporation." *Id.* at 33.

The court went on to hold that, inasmuch as the Mayor and the Burgesses accepted the charter from the King to become a town, they became legally bound to repair. The court implied the duty to repair as follows:

> "But this is a grant from the Sovereign, who is the parens patriae, and guardian of the realm; and the objects of the Royal bounty are a body corporate, endowed with perpetual succession. We think, looking at the whole instrument, that the things granted were the consideration for the repairing of the buildings, banks, sea-shores, & c., and that the corporation, by accepting the letters patent, bound themselves to do those re-

pairs. Such an obligation may exist by covenant, as well as by tenure; ...." *Id.* at 34.

The court held that the plaintiff Henley could sustain his action on the case for a direct and particular damage resulting from the failure of the Mayor and Burgesses to repair the sea wall. Relying upon the authority of this case, commentators have declared, "it is now well established in England that a municipal corporation may, under proper conditions, be held liable in an action sounding in tort." 57 Am. Jur. 2d, *Municipal, etc. Tort Liability* § 1 (1971).

Perhaps because they did not have the benefit of the *Lyme Regis* decision, many courts in American common-law jurisdictions embraced and tenaciously held to a broad rule of governmental immunity which prevented tort recovery against municipal corporations. This was done despite the careful qualifications made by the court in the annunciation of the *Russell* decision that an action would not lie against the inhabitants of an unincorporated county.

Beginning with the *Men of Devon* and moving chronologically forward, it appears that the initial decision in this Country adopting the rule of governmental immunity was *Mower v. Leicester,* 9 Mass. 247 (1812). Notable among the several early decisions of other jurisdictions adopting the rule was the oft-cited case of *Bailey v. The Mayor of the City of New York,* 3 Hill 531 (1842). The *Mower* and the *Bailey* cases are credited generally with responsibility for the American common-law rule:

> "[I]n the absence of statutory provision, there can be no recovery against a municipal corporation for injuries occasioned by its negligence or nonfeasance in the exercise of functions essentially governmental in character. In the exercise of such functions, the municipal corporation is acting for the general public as well as the inhabitants of its territory, and represents in such capacity the sovereignty of the state. No liability attaches to it at common law, either for nonuse or misuse of such power or for the acts or omis-

sions on the part of its officers or agents through whom such functions are performed, or of the servants employed by agencies carrying out governmental functions of the corporation." 57 Am. Jur. 2d, *Municipal, etc. Tort Liability* § 27, *supra.*

Although West Virginia is likewise credited as having ruled in accordance with the foregoing general rule [see *Jones v. City of Mannington, supra; Hayes v. Cedar Grove,* 128 W. Va. 590, 37 S.E.2d 450 (1946); *Hayes v. Cedar Grove,* 126 W. Va. 828, 30 S.E.2d 726 (1944); *Carder v. City of Clarksburg,* 100 W. Va. 605, 131 S.E. 349 (1926), and *Haney v. Town of Rainelle,* 125 W. Va. 397, 25 S.E.2d 207 (1943)], it is significant to note that examination of the Virginia decisions fails to disclose adoption of the broad rule of governmental immunity in the Commonwealth prior to the formation of this State. Although the governmental immunity rule since has been recognized and applied frequently in Virginia, with all of its accompanying distinctions and niceties, we are unable to find decisive declaration of that rule prior to 1867. In the decision of *City of Richmond v. Long's Adm'rs,* 17 Grat. 375 (1867), the court held:

> "Municipal corporations, in the exercise of their political, discretionary, and legislative authority, are not liable for the misconduct, negligence or omissions of the agents employed by them." *Syllabus* point 2., *id.*

Although not squarely confronting the rule of governmental immunity, that case gave tacit approval to the doctrine by affording the city immunity for the acts of its agents who, in the operation of a municipal hospital, negligently caused the death of a slave. The principal authority for the *City of Richmond* decision was *Bailey v. The Mayor of the City of New York, supra.*

Based upon this juridical chronology of the governmental immunity rule,—from English decisions, American adoption and Virginia cases, it is our view that the rule of governmental immunity for municipal corporations was not incorporated into our jurisprudence by the

constitutional provision or by *W. Va. Code* 1931, 2-1-1 or its predecessor version. Consequently, we believe the power to adopt, abrogate or modify the so-called rule of "municipal governmental immunity" from tort liability is not within the exclusive province of the Legislature. Insofar as *Hayes v. Cedar Grove*, 126 W. Va. *supra* holds to the contrary, it is overruled.

We now look to the history and development of the rule regarding municipal responsibility in this jurisdiction. In what appears to be the first confrontation of the problem, this Court, in the case of *Gillson v. The City of Charleston*, 16 W. Va. 282 (1880), held that where a city, in the process of grading its streets by cutting ditches and drains, collects surface water and casts it in a body upon the adjoining property of a private owner, that owner sustained a legal injury for which he may have recovery against the city. In discussing and rejecting a narrow application of the broad rule of municipal immunity from tort liability, the Court speaking through Judge Johnson noted at page 303:

> "Some of the authorities seem to regard a municipal corporation as a little monarchy acting for the public good, and absolutely without any responsibility for injuries inflicted upon individuals in case of raising or depressing the grade of the streets and thereby changing the natural course of the surface-water; . . . ."

Despite those authorities, Judge Johnson then said:

> "I see no reason why a municipal corporation should be exempt from liability, where it commits an act in the nature of a trespass to the injury of a citizen in carrying on its works of improvement, even though it has the right to grade its streets in such a manner as it determines." *Id.* at 303.

On the premise of the *Gillison* decision, the Court shortly thereafter spoke again on the subject in the case of *Wilson v. City of Wheeling*, 19 W. Va. 323 (1882).

In an exhaustive opinion prepared by Judge Alpheus F. Haymond, the Court noted and considered the previously discussed statutory duty making cities absolutely liable for injuries resulting from streets being "out of repair." The Court, while noting the statute, resolved the case on the basis of the city's common-law liability for negligence. The Court held that the municipal corporation would be liable for misfeasance or nonfeasance to an injured person where a dangerous excavation was made and negligently left open without proper lights, guards or covering, in a travelled street or sidewalk area of the city, although the excavation and negligence was done by a contractor with the city who was building a sewer and other improvements, and even though the city had no immediate control over the workmen of the contractor. The Court held:

> "The ground of the action is either positive misfeasance on the part of the corporation, its officers, or servants, or by others under its authority in doing acts, which cause the streets to be out of repair, in which case no other notice to the corporation is essential to its liability; or the ground of the action is the neglect of the corporation to put the streets in repair, or to remove obstructions therefrom, or to remedy causes of danger occasioned by the wrongful acts of others." Part *Syllabus* point 4., *id.*

> "If such reasonable precautionary measures are not adopted for the safety of the citizens and travelers, the city is culpable and liable for injuries, as it is, when it permits one of its graded streets to become unsafe for want of repairs." *Syllabus* point 9., *id.*

Within the opinion, the Court quoted with approval, the case of *City of St. Paul v. Seitz*, 3 Minn. 297 (1859):

> "[W]hen the city undertakes the improvement of a street by grading or otherwise, the authorities are bound to take care what they cause to be done shall not endanger the safety of the public. The city is in all cases responsible for such dan-

gers as are incident to, and consequent upon the nature of the work itself; . . . ." At 334 of the West Virginia Report.

Yet another case recognized that, in relation to public improvements on sidewalks and streets within a municipality, the city could sustain common-law as well as statutory liability. In *Bowen v. City of Huntington*, 35 W. Va. 682, 14 S.E. 217 (1891), the city was held liable for common-law negligence where a sidewalk installation was negligently done by a responsible abutting lot owner resulting in injury to the pedestrian who stepped into an unpaved depression. The Court held that while the city's absolute liability under the statute was suspended during the third person's excavation, the liability for negligence was not:

> "Where an injury has been sustained by a person on a sidewalk in an incorporated city or town, by reason of excavations made by an abutting lot-owner in order to lay down a pavement in conformity with the grade established by said town or city under its directions, although, during the progress of said improvement, the absolute liability imposed by section 53 of chapter 43 of the Code may be suspended, yet, in order to escape liability for an injury received by a party walking along said sidewalk in the night-time, without notice of such excavation, said work of improvement must not be conducted negligently by said lot owner while the work is progressing. Neither must said excavation, when the work is completed, be left in such a condition as to cause injury to pedestrians passing along said pavement in the night-time without notice of its condition." *Syllabus* point 1., *Bowen v. City of Huntington, supra*.

From those beginnings, West Virginia law took a different tack in 1886 with the decision of *Mendel & Co. v. City of Wheeling*, 28 W. Va. 233. In that case, because the city had apparently abandoned pipe lines in a part of its waterworks system, the plaintiff's building was destroyed by fire because of pipeline failure to furnish

water to fire fighters. The ultimate decision of that case was, as set forth in *syllabus* point 1.:

> "The power to organize and regulate water-works in a city being in its nature legislative or judicial, a failure of the corporate authorities to exercise the power does not render the city liable for damages caused by such failure."

The Court reasoned that the city's nonfeasance in failing to maintain its water system was *damnum absque injuria* because the power to engage upon the activity of furnishing water was discretionary with the municipal government in the first instance. In that somewhat convoluted decision, the Court confirmed the salutary principles of the previously decided West Virginia cases. First, it recognized that where a municipal corporation was, by its charter, authorized to do a certain thing, and, in the improper performance of its work it inflicted injury on any person, it was liable for the damage caused by such injury. Interestingly, in support of that proposition, the Court cited and relied upon the case of *Henley v. Lyme Regis, supra*. It is also significant to note that the Court nowhere in this decision, or any other discovered by this writer, placed direct reliance upon the *Men of Devon* case. Secondly, the Court discussed the cases of *Griffin v. City of Williamstown, supra; Sheff v. Huntington*, 16 W. Va. 307 (1880), and *Wilson v. City of Wheeling, supra*, and opined:

> "Whether under statutes or upon common law principles municipal corporations are now very generally held liable for negligence in failing to keep their streets in repair." At 243, *Mendel, supra*.

Third, the Court also recognized the law of the *Gillison* case, *supra*, that the city would be liable for the surface water damage caused by the negligent grading of its streets.

Next, the Court took the significant step: based upon a misunderstanding of the holding in the *Lyme Regis* case, upon the case of *Bailey v. The Mayor of the City of New*

*York, supra*, the bastardized descendant of the *Men of Devon* decision, and upon numerous cases from other jurisdictions following the broad rule of governmental immunity, the Court opined at pages 247-48:

> "It seems therefore to be well settled, that, when a municipal corporation through its officers as agents is merely carrying out or exercising its purely governmental powers, it is not liable for any negligence of its officers or agents. This is so held from the wisest public policy; because, should a different rule obtain, municipal corporations could not exist."

Then, to conclude the "fell swoop" the Court followed with:

> "But there is another large class of cases, in which the powers of a municipal corporation are extended beyond what is strictly necessary for the protection of the lives, health, prosperity and peace of its citizens; as where it carrys on works of internal improvement, and in the construction of these works there is misfeasance, and by the unskillful and careless doing of the thing authorized to be done, persons or property are injured. In such cases the municipal corporation is held liable."

Thus, the Court adopted the initial statement of what was to become a nightmarish distinction in the law of municipal liability: the "governmental-proprietary" dichotomy. On the premise that cities were required only to provide such purely governmental functions as extinguishing fires, taking care of the sick, protecting citizens in their personal rights and keeping of the peace, but were given the discretion of engaging in other functions, such as constructing works of public improvement for profit, or in supposed competition with private enterprise, cities absolutely were not to be liable for the negligent exercise of required duties but should be liable in the negligent performance of proprietary activities discretionarily assumed. Accordingly, the *Mendel* case held that the city was not liable for its failure to maintain

that which was purely a discretionary activity, that is, failure to provide water from municipal waterworks to fire fighters. On the other hand, the case clearly recognized the following rule:

> "[W]here the city is constructing a work of internal improvement, which in its discretion it may or may not construct, or having constructed may or may not abandon, any injury inflicted upon persons or property through negligence in the construction of such work or negligence in its operation, where the city is guilty of *misfeasance* in doing the work, it is liable in damages to the party injured." *Id.* at 257.

Shortly thereafter, Judge Dent, speaking for a unanimous Court in *Gibson v. City of Huntington*, 38 W. Va. 177, 18 S.E. 447 (1893), classified the bases of municipal tort liability in this jurisdiction:

> "It is now firmly established, by a long line of well-considered decisions, that a municipal corporation is liable for injuries occasioned by its negligence in the following three classes of cases: (1) Failure to keep its streets, alleys sidewalks, roads and bridges in repair under statute;—(2) In the discharge of ministerial or specified duties, not discretionary or governmental, assumed in consideration of the privileges conferred by charter, even though there be the absence of special rewards or advantages;—(3) as a private owner of property to the same extent as individuals are liable." *Id.* at 178 of the West Virginia Report.

In that case, which affirmed a jury verdict prosecuted on a negligence theory in favor of the estate of a deceased child who was killed on a city right-of-way when an embankment maintained by the city collapsed, crushed and smothered the child, the Court did not classify the maintenance of roads or streets as governmental or proprietary but rather classified the city's duty not to injure anyone with "anything dangerous" as ministerial. The Court said:

> "This suit is not proper under the first class or statutory provision, because it was not caused by

any defect or obstruction in the roadbed; but it can be maintained under the two latter classes, *because it is made the ministerial duty of the municipality by law to protect the public and individuals from anything dangerous,* and the embankment that caused the injury was maintained by the city as its property in lieu of other barrier along and within the boundaries of a public highway. The city has no more right to erect or keep within or along a public highway an unnecessarily dangerous structure, even though it be for some public purpose, than a citizen has. It is true that the city did not erect this embankment, but, as the witness said, it was placed there by nature, and the city adopted and maintained it as a barrier to prevent travelers from driving into the creek. Had there been an artificial structure so rudely constructed of stone, wood or iron as to fall of its own weight and crush this child, the liability of the city would not have been questioned; and it certainly ought to make no difference whether the city builds or adopts one already there, even though nature was the original builder. *It was its ministerial duty, neither governmental nor discretionary, to see that it was not dangerous to any one lawfully using the road or any part thereof.* By leaving the embankment there as such barrier, the council fixed the limits of the road, and any one using it had the right to lawfully use it, up to the limit so fixed, whether it was the travelled part of the road or not." (Emphasis supplied). *Id.* at 179.

We believe this was a salutary decision for at least two reasons. The Court recognized that the "governmental-proprietary" distinction was not premised upon whether the activity scrutinized conferred special advantage or profit upon the municipality. Secondly, the Court did not turn its decision on whether the duty of the city, being governmental, discretionary or ministerial, originated in any particular governmental or discretionary activity. In this respect, it did not explore whether the child's death occurred incident to a road building or road main-

tenance activity, but rather, whether the city had a duty to remedy a dangerous condition or to refrain from misfeasance causing a dangerous activity to occur. If this method of analysis had been pursued in succeeding decisions of this Court, the "governmental-proprietary" distinction of liability would not have gained the unwarranted and incomprehensible significance it now occupies.

In an unsophisticated time when demands for governmental services were few and simple of description, perhaps it was correct to say that extinguishing fires, caring for the sick, protecting the citizens in their personal rights and keeping the peace represented the full range of government's mandated responsibilities to its citizens. Perhaps then it was easy to say that any other activity, for example, constructing works of improvement, building roads and streets, supplying water to residences within the municipality and retrieving sewage were completely discretionary with the governmental body. It is obviously not so today.

The rationale of the *Mendel* decision foreshadows the basic problem confronting courts today in the development of this area of the law. "Progress", changing social needs, and the demands of the tax-paying public have vastly increased the duties and responsibilities of all forms of government. This is particularly true in respect of municipal governments. At the same time, the increase in governmental activity and the gradual urbanization of our population, even in a State which is uncrowded like our own, has resulted, correspondingly, in an increase of risk to the public from the negligent actions or omissions of governments, their agents and servants.

The decisions of this Court reflect the many possibilities, and yet unforeseeable potentials, for inadvertent government harm of its citizens. Because this Court, since the *Mendel* decision, has focused its adjudications for compensating harm caused by the negligence of municipal governments on the basis of whether the harm-

ful activity was conducted in a governmental or a proprietary capacity, and because these decisions ignore the factor of actionable negligence, or the lack thereof, they have proved to be unsatisfactory to the courts and litigants alike. Municipal governments are at a loss to determine the extent of their potential liability to those who are harmed by their negligence. Consequently, cities, who are most often pressed financially, are in a quandary when attempting to insure against the risks involved when their scope and extent are unknown. From the aspect of a person injured by otherwise actionable negligence, one does not know whether he will have to suffer harm without recompense or whether he will be adequately compensated for the damage done him since he does not "choose" his tort-feasor. The law should provide more certainty than it has.

Since the decision in the *Mendel* case in 1886, this Court has held the following activities to be purely governmental and the harm from which no recovery could be had. For example: the negligent operation of a municipal airport, *Van Gilder v. Morgantown*, 136 W. Va. 831, 68 S.E.2d 746 (1949); organizing and regulating waterworks and fire departments, *Mendel & Co. v. Wheeling, supra*; maintaining a city reservoir, *Ritz v. Wheeling*, 45 W. Va. 262, 31 S.E. 993 (1898); the operation of a municipal prison, *Shaw v. Charleston*, 57 W. Va. 433, 50 S.E. 527 (1905); *Brown's Adm'r v. Guyandotte*, 34 W. Va. 299, 12 S.E. 707 (1890), or its appurtenances, *Haney v. Town of Rainelle*, 125 W. Va. 397, 25 S.E.2d 207 (1943), and opening, grading and paving streets, *Morgan v. City of Logan*, 125 W. Va. 445, 24 S.E.2d 760 (1943); *Jones v. City of Mannington*, 148 W. Va. 583, 136 S.E.2d 882 (1964).

On the other hand, this Court has held the following activities to be merely proprietary and negligence occurring in connection therewith resulting in harm has been held to furnish a basis for recovery. For example: operation of a municipal park, *Warden v. Grafton*, 99 W. Va. 249, 128 S.E. 375 (1925); maintaining a waterworks system for domestic use, *Wigal v. Parkersburg*, 74 W. Va. 25, 81 S.E. 554 (1914); *Jacson v. City of Parkersburg*, 74 W.

Va. 37, 81 S.E. 559 (1914); negligent management of corporate property, *Gibson v. Huntington*, 38 W. Va. 177, 18 S.E. 447 (1893); maintenance of a municipal swimming pool, *Ashworth v. Clarksburg*, 118 W. Va. 476, 190 S.E. 763 (1937); and quarrying operations carried on as a necessary incident to street repairs, *Harrison v. McOwen*, 126 W. Va. 933, 30 S.E.2d 740 (1944).

The foregoing decisions comparatively illustrate the inherent uncertainty and incomprehensibility of predictable results attendant to the "governmental-proprietary" distinction. It is so unworkable in application that it has caused both judicial confusion and oversight in respect to prior decisions. For example, compare *Jones v. City of Mannington, supra*, where this Court recently held that the maintenance of highways and streets was a governmental function with the decision in *Gibson v. The City of Huntington, supra*, where nonfeasant maintenance of streets resulting in harm provided a basis for recovery because the duty involved was characterized as "ministerial."

For the foregoing reasons, we believe the rule of municipal governmental immunity from tort liability previously applied in this jurisdiction to be unsound and unworkable. In moving toward resolution of this problem we are acutely aware of the constraints of the doctrine of *stare decisis*. Although, indeed, it would seem preferable for the Legislature to speak comprehensively on the subject, we do not wish to perpetuate bad law of judicial origin pending the fortuity of action by the Legislature. As respects the doctrine of *stare decisis*, the writer calls upon the words and recitations of Justice Caplan in the decision of *Adkins v. St. Francis Hospital*, 149 W. Va. 705, 143 S.E.2d 154 (1965). In the process of overruling the doctrine of charitable immunity, the Court said:

> "We think that it is sufficient to say that a rule or principle of law should not be adhered to if the only reason therefor is that it has been sanctified by age. As expressed in *Lovings v. Norfolk & W. Ry. Co.*, 47 W.Va. 582, 35 S.E. 962, 'It has been

well said that "it is better to be right than to be consistent with the errors of a hundred years".'

"Another cogent observation relating to the force with which the policy of stare decisis should be applied is contained in the concurring opinion of Judge Brannon in *Town of Weston v. Ralston*, 48 W. Va. 170, 36 S.E. 446, as follows: 'No legal principle is ever settled until it is settled right. The true rule is laid down in 23 Am. & Eng. Ency. L. 36: "No prior decision is to be reversed without good and sufficient cause, yet the rule is not in any sense ironclad, and the future and permanent good to the public is to be considered rather than any particular case or interest.... Where vital and important public and private rights are concerned, and the decisions regarding them are to have a direct and permanent influence in all future time, it becomes the duty as well as the right of the court to consider them carefully, and to allow no previous error to continue, if it can be corrected. The reason that the rule of *stare decisis* was promulgated was on the ground of public policy, and it would be an egregious mistake to allow more harm than good to accrue from it....' " *Id.* at 718-19.

Undoubtedly, the broad rule of municipal governmental immunity from tort liability was severely erroded, if not obliterated, by this Court's recent decision in the *Higginbotham* case, *supra*. We have come to believe that its remaining applicability should be absolutely terminated by this decision. Consequently it is now abolished in this State. This ruling applies to the instant appeal and, accordingly, the judgment of the Circuit Court of Hancock County must be reversed on this point.

Now and hereafter, a municipal corporation shall be liable, as if a private person, for injuries inflicted upon members of the public which are proximately caused by its negligence in the performance of functions assumed by it. The previously discussed "governmental-proprietary" distinctions are intended to be abrogated and

declared obsolete by the force of this ruling. Our previous decisions in the case of *Jones v. City of Mannington, supra*, and its progenitors are overruled insofar as they purport to immunize a municipal government from liability for negligence of its officers or agents in the discharge of or omission to discharge duties which were previously characterized as "purely governmental in character."

By so ruling, West Virginia joins "the ever-increasing number of jurisdictions which have judicially abrogated this antiquated doctrine." *Ayala v. Philadelphia Board of Public Education*, 453 Pa. 584, 305 A.2d 877, 878 (1973). See, e.g., *Spencer v. General Hospital of District of Columbia*, 138 U.S.App D.C. 48, 425 F.2d 479 (1969); *Campbell v. State*, 284 N.E.2d 733 (Ind. 1972); *Evans v. Board of County Commissioners*, 174 Colo. 97, 482 P.2d 968 (1971); *Flournoy v. School District No. 1*, 174 Colo. 110, 482 P.2d 966 (1971); *Smith v. State*, 93 Idaho 795, 473 P.2d 937 (1970); *Willis v. Department of Conservation and Econ. Dev.*, 55 N.J. 534, 264 A.2d 34 (1970); *Becker v. Beaudoin*, 106 R.I. 562, 261 A.2d 896 (1970); *Brown v. City of Omaha*, 183 Neb. 430, 160 N.W.2d 805 (1968); *Parish v. Pitts*, 244 Ark. 1239, 429 S.W.2d 45 (1968); *Veach v. City of Phoenix*, 102 Ariz. 195, 427 P.2d 335 (1967); *Haney v. City of Lexington*, 386 S.W.2d 738, (Ky. 1964); *Sherbutte v. Marine City*, 374 Mich. 48, 130 N.W.2d 920 (1964); *Rice v. Clark County*, 79 Nev. 253, 382 P.2d 605 (1963); *Scheele v. City of Anchorage*, 385 P.2d 582 (Alaska 1963); *Spanel v. Mounds View School District No. 621*, 264 Minn. 279, 118 N.W.2d 795 (1962); *Holytz v. City of Milwaukee*, 17 Wis.2d 26, 115 N.W.2d 618 (1962); *Muskopf v. Corning Hospital District*, 55 Cal.2d 211, 11 Cal.Rptr. 89, 359 P.2d 457 (1961); *Williams v. City of Detroit*, 364 Mich. 231, 111 N.W.2d 1 (1961); *Molitor v. Kaneland Community Unit District No. 302*, 18 Ill.2d 11, 163 N.E.2d 89 (1959); *Hargrove v. Town of Cocoa Beach*, 96 So.2d 130 (Fla. 1957).

We wish to note that the instant decision abolishing the doctrine of municipal governmental immunity from tort liability should not be taken likewise to have abro-

gated the supposed immunities of county governments. The question of immunity, or lack thereof, of counties in respect to their governmental activities represent an analogous and similar but different body of law in this jurisdiction. The distinctions are noted and made in the representative cases of *Watkins v. County Court*, 30 W. Va. 657, 5 S.E. 654 (1888) and *Cunningham v. County Court*, 148 W. Va. 303, 134 S.E.2d 725 (1964). Review of those matters shall remain for another day.

Appellant's fifth proposition is as follows:

"SPECIAL DAMAGES WHICH ARE UNSUP-PORTED BY THE EVIDENCE AND CON-CERNING WHICH THERE IS NO PROOF OF RIGHT TO RECOVER SHOULD NOT BE SUB-MITTED TO THE JURY. DAMAGES AWARDED TO AN INFANT CANNOT BE RECOVERED BY THE MOTHER WHEN THE FATHER IS LIVING AND HAS QUALIFIED AS LEGAL GUARDIAN."

Several deficiencies are assigned to the evidence of medical expenses, including the failure of the testimony of Dr. Oliver Joseph Thomas to show that the "medical expenses were the natural result of and connected with the original injuries complained of by the infant plaintiff." The requirement that medical expenses must be reasonable and necessary, be related to the accident and injuries complained of and, as to future medical expenses, be based upon reasonable certainty, is not questioned. This Court very recently had occasion to review and apply such standards in the case of *Jordan v. Bero*, ____ W. Va. ____, 210 S.E.2d 618 (1974). *See also, Hall v. Groves*, 151 W. Va. 449, 153 S.E.2d 165 (1967); *Pygman v. Helton*, 148 W. Va. 281, 134 S.E.2d 717 (1964); *Shreve v. Faris*, 144 W. Va. 819, 111 S.E.2d 169 (1959).

Dr. Thomas, on direct examination, described the plaintiff's injuries in detail. He testified concerning the cost of the operations already performed and, also, estimated the cost of future operations and hospitalization. His initial testimony concerning future expenses was, on

motion of the defendants, stricken. Counsel for the plaintiff was thereafter given leave to ask the questions again, within the framework of reasonable medical certainty. Essentially the same responses as previously elicited, this time based upon reasonable medical certainty, were adduced into evidence. Taking the record in this case by its four corners, it is clear beyond peradventure that the medical expenses—past and future—resulted from and were connected and connectible with the original injury. Moreover, the requirement of reasonable medical certainty was clearly satisfied in this case by the re-examination of Dr. Thoms. We, therefore, find no error in this regard. See *Jordan v. Bero, syllabus* point 15., *supra.*

The assignment of error concerning the apportionment of medical expenses between the mother and natural father does reveal some weakness in the plaintiff's proof concerning the proper allocation of the award. Nevertheless, the trial court in its charge to the jury permitted consideration of an award to the natural father of nurses' expenses, for Dr. Mikita's bill, and for the Weirton General Hospital bill. While there is no direct evidence of actual payment of such expenses by the natural father, the award in such case is predicated on proof of the reasonable value of such expenses necessarily incurred by the defendants' negligence and not upon the actual expenses paid. See, *Jordan v. Bero, supra,* at 637 of the South Eastern Reporter; compare, *Kretzer v. Moses Pontiac Sales, Inc.,* W. Va., 201 S.E.2d 275, 281 (1974). Although, at the time of the accident, the infant plaintiff's natural mother and father were divorced, the natural father's obligation for necessary medical expenses was not necessarily terminated. The duty of maintenance on the part of the fathers in respect to their infant children is a principle of natural law, founded upon common sense and natural justice. Where the child is living away from the father, the question of his liability will depend upon the circumstances of the case. *Buchanan v. Buchanan,* 170 Va. 458, 197 S.E. 426 (1938); *Mihalcoe v. Holub,* 130 Va. 425, 107 S.E. 704 (1921). See

also, *Rakes v. Ferguson*, 147 W. Va. 660, 130 S.E.2d 102 (1963). The infant plaintiff was not adopted by Mr. Conley until 1966—some three years after the accident. Under the circumstances in this case, the recovery of such expenses by the natural father, clearly shown to have been incurred, was proper.

The recovery by the natural mother of the out-of-pocket expenses and for future expenses was, we believe, likewise, proper in this case. With all due deference to the traditional concept of paternal preference in the responsibility for the care of a minor, it appears that such concept has long since yielded to the more rational realization that the father and mother may be equally responsible and qualified to tend to the requirements and needs of an infant child. *Barker v. Saunders*, 116 W. Va. 548, 182 S.E. 289 (1935), cited by counsel for the appellant, appears to support rather than condemn the action taken by the trial court in this case. The rule therein stated is as follows:

> "It is well settled in this country that where a minor child is injured by the wrongful act or omission of another, the father, or mother, *if she be the natural guardian*, may recover for the loss of such child's services and for medical or surgical attendance, nursing, and other expenses, incurred by such parent in consequence of the injury." (Emphasis supplied). *Id.* at 549.

Under the circumstances in this case, it would appear that the mother was, indeed, the natural guardian of the infant plaintiff at the time of recovery and, therefore, entitled to recover for medical or surgical, nursing, and other expenses accruing as a consequence of the injury. See also, W. Va. *Code* 1931, 44-10-7, as amended. Although the basis for the allocation of such expenses between the mother and natural father was not documented in the record, the liability therefor was clearly established. The error, if any, was harmless. *Abdulla v. Pittsburgh and Weirton Bus Co.*, ___ W. Va. ___, S.E.2d (1975). Consequently, we perceive no possible prejudice

resulting from the allocation. Accordingly, we find no merit in the assignments relating to proposition number five.

Appellant's sixth proposition is as follows:

"THE TRIAL COURT HAD NO LEGAL RIGHT TO RESUBMIT THE CASE TO THE JURY AFTER THE FIRST VERDICT. THE VERDICT SHOULD BE CORRECTED BY THE TRIAL COURT BEFORE DISCHARGE OF THE JURY."

The first verdict returned by the jury assessed special damages of $16,545.00 against the gas company and the remaining damages against the City of Weirton, and was, therefore, patently improper. The court instructed that the verdict was inconsistent and returned the jury for further deliberation. The jury subsequently returned a joint verdict against appellant and the City.

The case of *Brewer v. Appalachian Constructors, Inc.*, 138 W. Va. 437, 76 S.E.2d 916 (1953) is dispositive of this issue. In that case, as in the instant case, the trial court properly rejected a verdict disproportionately allocating the award against joint tort-feasors among them. The Court held that the first verdict returned by the jury was not in proper form. Further, the Court noted:

"As a corollary to the foregoing it follows that it then and there became the duty of the trial court in the conduct of this important case to require the jury to retire for the purpose of arriving at and returning a proper verdict; and in doing so the trial court *ex necessitate* had the duty, as it did, to tell the jury why the court had rejected its verdict, and its instructions in that regard were clear, and properly informed the jury as to its duty. By this oral instruction the court told the jury that 'If you find for the plaintiff against any one or more of the four defendants, you cannot divide the amount of your verdict between the defendants against whom you find, but must find one sum against all of those against whom you find.'" *Id.*, at 448.

We therefore, find no error in this regard.

Proposition No. 7 asserts:

"CROSS EXAMINATION MAY NOT EXCEED THE SCOPE OF DIRECT."

Having carefully examined the testimony adduced by the cross-examination of H. C. Coast, we are of the opinion that the appellant was not prejudiced, although cross-examination obviously exceeded the scope of the direct examination.

"The extent of the cross-examination of a witness is a matter within the sound discretion of the trial court; and in the exercise of such discretion, in excluding or permitting questions on cross-examination, its action is not reviewable except in case of manifest abuse or injustice." *Syllabus* point 4., *State v. Carduff*, 142 W. Va. 18, 93 S.E.2d 502 (1956). See also, *State v. Wolfe*, 99 W. Va. 694, 129 S.E. 748 (1925).

Perceiving no manifest injustice or abuse of discretion by the trial court in this regard, we find no merit in appellant's proposition number seven.

Appellant's Proposition No. 8 asserts:

"IT WAS ERROR TO REFUSE THE GRANTING OF A NEW TRIAL SINCE THE VERDICT IS EXCESSIVE, AGAINST THE WEIGHT OF THE EVIDENCE, AND IS SO HIGH TO CREATE BY ITS MERE SIZE A CONCLUSION THAT THE VERDICT WAS RENDERED AS A RESULT OF PASSION, PREJUDICE, OR LACK OF DUE CONSIDERATION OF THE EVIDENCE."

The established rule in this State is that the damages assessed by the jury in a personal injury case will not be set aside by this Court unless so excessive as to indicate, as a matter of law, passion, prejudice, partiality, mistake or lack of due consideration. *Abdulla v. Pittsburgh and Weirton Bus Co., supra; Jordan v. Bero, supra; Cowan v. One Hour Valet, Inc.*, 151 W. Va. 941, 157 S.E.2d 843 (1967); *Williams v. Penn Line Service, Inc.*, 147 W. Va.

195, 126 S.E.2d 384 (1962); *Sargent v. Malcomb*, 150 W. Va. 393, 146 S.E.2d 561 (1966).

A careful review of the evidence reveals no indication that the verdict was influenced by passion, partiality or prejudice, or that the verdict resulted from the jury's failure to give due consideration to the evidence. The infant plaintiff's injuries, despite a somewhat optimistic prognoses by Dr. Thoms, the plastic surgeon, are unquestionably permanent. Dr. Thoms anticipated seven additional cosmetic operations to minimize the appearance of the scarring shown in the exhibited photographs [Exhibits Nos. 5-A through 5-L]. This, coupled with the pain and suffering necessarily resulting from the accident, justified, in our view, the award in this case. Here, as in any such case, the jury was better able to assess the full extent of the plaintiff's injuries. We therefore find no error in this regard.

Appellant's ninth proposition is in the following language:

> "A CHARGE WRITTEN BY THE COURT AND DELIVERED TO THE JURY WHICH OMITS ANY MATERIAL THEORY OF ANY PARTY IS ERRONEOUS AND THE COURT IS DUTY BOUND TO ACCEPT INSTRUCTIONS TO SUPPLEMENT ITS CHARGE IF THE INSTRUCTION CLEARLY STATES THE LAW."

A comprehensive review of the tendered instructions reveals that such of those as were proper were incorporated and fairly presented in the trial court's charge to the jury; the remaining instructions were properly amended or refused:

> "Although a court is required to instruct or charge a jury on every important theory of claim or defense supported by the evidence of the case, the court is not bound thereby to charge the jury in the exact language proffered by a party's instruction. Within the constraints of fairly presenting all parties' conflicting theories, the court is authorized by *Code* 1931, 56-6-19 to deviate

from the language of proffered instructions so as to effect an ordered and logically connected charge to the jury." *Syllabus* point 2., *Parker v. Knowlton Construction Company, Inc.*, ____ W. Va. ____, S.E.2d (1975).

As noted earlier, we find no rational basis for imposing the requirement that negligence and proximate cause be established beyond "both a possibility and probability."

The amendment to appellant's Instruction No. 4, was, therefore, proper. Appellant's Instruction No. 2 failed to take into account the plaintiffs' theory of concurrent negligence discussed in Propositions Nos. 1 and 3, *supra*, and was, therefore, properly rejected by the trial court. Appellant's Instruction No. 3, as tendered, was fairly and adequately covered in the charge to the jury. We find no indication that the failure to give that instruction was "tantamount to inserting into the case the issue of 'intervening cause' ..." as to the appellant. Appellant's Instruction No. 5 related to the quantum of proof and likewise was fairly presented to the jury in the charge. Appellant's tendered Instruction No. 6 appears to be a conglomeration of some of the propositions previously discussed; and those theories which were proper for the jury's consideration were adequately covered in the charge. Appellant's Instruction No. 7 pertained to the element of foreseeability, which was adequately defined in the charge. The tenor of the rejected instruction on foreseeability was, that in order to find for the plaintiffs and against the defendants, the jury should find that the precise injury resulting in this case was foreseeable by the defendants. It is, of course, not required that the particular injury be anticipated, only that an injury may result. See, *McClary v. Knight*, 73 W. Va. 385, 80 S.E. 866 (1913).

Appellant's Instruction No. 8 apparently was intended to offset the effect of that portion of the charge which, appellant contends, "in a sense imposes a duty to warn on Manufacturers which is unconditional." The charge,

in our view, properly instructed on the gas company's duty by stating that negligence, if any, might properly be predicated upon appellant's failure to act within a reasonable time after being informed of the gas leak, knowing that an explosion was foreseeable. The instructed duty to warn was properly conditioned upon the circumstances shown by the evidence in this case.

Upon all of the foregoing, we find no reversible error in this case, except as determined by the re-examination of the rule of governmental immunity discussed in Proposition No. 4, *supra.*

As a final matter, the motions of Tri-State Asphalt Corporation and James White Construction Company are sustained. The question of whether these appellees were borrowed servants or independent contractors in their relationship with the City was properly one of both law and fact. See *Thompson v. Norfolk & Western Ry. Co.,* 116 W. Va. 705, 182 S.E. 880 (1935); *Layne v. Chesapeake & Ohio Ry. Co.,* 66 W. Va. 607, 67 S.E. 1103 (1909). The jury was properly charged in that regard and its refusal to return a verdict against these parties must be recognized as exonerating the movants from liability. A verdict by which a plaintiff recovers against one or more defendants but which is silent as to others is a verdict in favor of the defendants not named. *Facchina v. Richardson,* 213 Va. 440, 192 S.E.2d 791 (1972). See, *Jones, Inc. v. W. A. Wiedebusch Plumbing and Heating Co.,* ____ W. Va. ____, 201 S.E.2d 257 (1973). The rule applies whether the defendants are master and servant or joint tort-feasors. *Mobley v. Pendleton,* 212 Va. 418, 184 S.E.2d 798 (1971); *Ivanhoe Furnace Corp. v. Crowder's Adm'r.,* 110 Va. 387, 66 S.E. 63 (1909); see 19 M.J. *Verdict* § 19 (1952 and 1974 cum.supp.).

Considering the complexity of this case, the difficult issues involved, the number of parties and the voluminous testimony, we are of the opinion that this action was tried with commendable fairness and astuteness by the late Judge Pryor. Moreover, we eulogize his learned ability to amalgamate the traditional disarray of some-

what confusing instructions into a concise, understandable charge to the jury. Statistically, the decisions of this Court would seem to indicate that settlement of instructions may be the most precarious and vulnerable function of the trial court. Judge Pryor's constant attention to the goal of presenting understandable charges exemplified the judiciary's best efforts toward trial reform.

For the reasons assigned, the judgment of the Circuit Court of Hancock County is affirmed in part, reversed in part, and remanded for reinstatement of the verdict against the City of Weirton in accordance with this opinion.

*Affirmed in part; reversed in part; and remanded with directions.*