632 S.E.2d 330

Jeremy BENDER, Travis Sturm, Jason Gregory, and Jason Brooks, Plaintiffs Below,

Jeremy Bender, Appellant,

v.

Donald Ray GLENDENNING, Jr., and the Webster County Board of Education, Defendants Below, Appellees,

and

The Webster County Board of Education, Defendant and Third–Party Plaintiff Below, Appellee,

v.

Donald Ray Glendenning, Jr., Third–Party Defendant Below, Appellee,

and

Donald Ray Glendenning, Jr., Fourth–Party Plaintiff Below, Appellee,

v.

Continental Casualty Company, A CNA Company, Fourth–Party Defendant Below, Appellee.

and

Jeremy Bender, Travis Sturm, Jason Gregory, and Jason Brooks, Plaintiffs Below,

Travis Sturm, Jason Gregory, and Jason Brooks, Appellants,

v.

Donald Ray Glendenning, Jr., and the Webster County Board of Education, Defendants Below, Appellees,

and

The Webster County Board of Education, Defendant and Third–Party Plaintiff Below, Appellee,

v.

Donald Ray Glendenning, Jr., Third–Party Defendant Below, Appellee,

and

Donald Ray Glendenning, Jr., Fourth–Party Plaintiff Below, Appellee,

v.

Continental Casualty Company, A CNA Company, Fourth–Party Defendant Below, Appellee.

No. 32862, 32863.

Supreme Court of Appeals of West Virginia.

Submitted Feb. 28, 2006.

Decided May 12, 2006.

Dissenting Opinion of Justice Benjamin May 16, 2006.

Dissenting Opinion of Justice Maynard June 22, 2006.

Concurring Opinion of Justice Starcher July 11, 2006.

Gregory Sproles, Breckinridge, Davis, Sproles & Chapman, PLLC, Summersville, Charles K. Garnes, Jr., Kenneth P. Hicks, Kenneth P. Hicks, LC, Huntington, for the Appellant.

William A. McCourt, Jr., Losch & McCourt, PLLC, Summersville, for the Appellants.

Charles R. Bailey, David J. Mincer, Jason A. Winnell, Bailey & Wyant, P.L.L.C., Charleston, for the Appellee.

PER CURIAM:

The appellants [1] herein and plaintiffs below, Jeremy Bender, Travis Sturm, Jason Gregory, and Jason Brooks [hereinafter collectively referred to as "Mr. Bender"], appeal from an order entered December 9, 2004, by the Circuit Court of Webster County. By the terms of that order, the circuit court awarded summary judgment to Continental Casualty Company [hereinafter referred to as "Continental"],[2] finding that the policy of insurance issued by Continental to the Webster County Board of Education [hereinafter referred to as "the Board"] did not provide coverage for the acts of sexual misconduct

---

1. This matter originated as two different appeals: one filed by Jeremy Bender, Case Number 32862, and one filed by the remaining appellants, Travis Sturm, Jason Gregory, and Jason Brooks, Case Number 32863. Due to the similarity of the parties and the identical nature of the issues involved in both appeals, this Court consolidated these two cases "for purposes of argument, consideration and decision" by order entered October 6, 2005. The underlying matters from which these appeals originated previously had been consolidated by the circuit court.

2. It appears that National Union Fire Insurance Company of Pittsburgh, PA, who filed the appellee's responsive brief on behalf of Continental Casualty Company in this proceeding, has replaced Continental pursuant to a novation agreement. To maintain consistency with the lower court's proceedings, however, we will continue to refer to the insurer at issue in this case as "Continental".

which the various appellants allege that the Board's former [3] employee, Donald Ray Glendenning, Jr. [hereinafter referred to as "Mr. Glendenning"], committed against them. On appeal to this Court, the appellants argue that the circuit court erred by granting summary judgment in favor of Continental and by concluding that the subject policy of insurance did not provide coverage for Mr. Glendenning. Upon a review of the parties' arguments, the record designated for appellate consideration, and the pertinent authorities, we agree with the appellants and find that the Continental insurance policy did, in fact, provide coverage for the acts of sexual misconduct that the appellants have alleged against Mr. Glendenning. Accordingly, we reverse the December 9, 2004, order of the Circuit Court of Webster County and remand this case for further proceedings consistent with this opinion.

## I.

## FACTUAL AND PROCEDURAL HISTORY

The events from which the instant proceeding originated began during the 1994–95 school year and are not disputed by the parties. At that time, Mr. Bender, as well as Mr. Sturm, Mr. Gregory, and Mr. Brooks, were students at Diana Elementary School in Webster County, West Virginia. Mr. Glendenning was the boys' teacher. Mr. Bender complained that Mr. Glendenning had allegedly sexually assaulted him, and, during the course of a criminal investigation of those charges, Mr. Glendenning admitted to having also sexually abused and/or assaulted Mr. Sturm, Mr. Gregory, and Mr. Brooks.

By order entered March 5, 1999, the Circuit Court of Webster County accepted Mr. Glendenning's pleas of guilty to one count of sexual abuse by a parent, guardian, or custodian [4] and one count of sexual assault in the third degree [5] for the instances of sexual misconduct alleged by Mr. Bender. The circuit court, by order entered June 22, 1999, subsequently sentenced Mr. Glendenning to the West Virginia Penitentiary for a term of not less than Five (5) nor more than Fifteen (15) years for the felonious crime of sexual abuse by a parent, guardian, or custodian and not less than One (1) nor more than Five (5) years for the feloni-

---

**3.** Mr. Glendenning was employed by the Webster County Board of Education at all times relevant to the coverage question at issue in this proceeding. His employment with the Board has since been terminated.

**4.** At the time of the events at issue in this proceeding, W. Va.Code § 61–8D–5(a) (1991) (Repl. Vol.1997) directed that

[i]n addition to any other offenses set forth in this code, the Legislature hereby declares a separate and distinct offense under this subsection, as follows: If any parent, guardian or custodian of a child under his or her care, custody or control, shall engage in or attempt to engage in sexual exploitation of, or in sexual intercourse, sexual intrusion or sexual contact with, a child under his or her care, custody or control, notwithstanding the fact that the child may have willingly participated in such conduct, or the fact that the child may have consented to such conduct or the fact that the child may have suffered no apparent physical injury or mental or emotional injury as a result of such conduct, then such guardian or custodian shall be guilty of a felony, and, upon conviction thereof, shall be imprisoned in the penitentiary not less than five nor more than fifteen years, or fined not less than five hundred nor more than five thousand dollars and

imprisoned in the penitentiary not less than five nor more than fifteen years.

This section subsequently was amended in 1998 and 2005. *See* W. Va.Code § 61–8D–5 (1998) (Repl.Vol.2000); W. Va.Code § 61–8D–5 (2005) (Supp.2005).

**5.** The crime of sexual assault in the third degree is set forth in W. Va.Code § 61–8B–5 (1984) (Repl.Vol.1997) which provides, in pertinent part, that

(a) A person is guilty of sexual assault in the third degree when:

. . . .

(2) Such person, being sixteen years old or more, engages in sexual intercourse or sexual intrusion with another person who is less than sixteen years old and who is at least four years younger than the defendant.

(b) Any person who violates the provisions of this section shall be guilty of a felony, and, upon conviction thereof, shall be imprisoned in the penitentiary not less than one year nor more than five years, or fined not more than ten thousand dollars and imprisoned in the penitentiary not less than one year nor more than five years.

After the time of the events at issue herein, the Legislature amended this section. *See* W. Va. Code § 61–8B–5 (2000) (Repl.Vol.2005).

ous crime of sexual assault in the 3rd degree with sentences to run consecutively,

which sentences he currently is serving.

Thereafter, on about July 6, 2001, Mr. Bender, Mr. Sturm, Mr. Gregory, and Mr. Brooks filed civil actions against Mr. Glendenning claiming that they had all been victims of Mr. Glendenning's sexual abuse and/or assault and for which injuries they now sought damages.[6] During the course of this litigation, on April 13, 2004, Mr. Glendenning filed a petition for declaratory relief asking the circuit court to ascertain whether the Board's policy of insurance with Continental provided coverage to him for the aforementioned claims. Specifically, Mr. Glendenning argued that because he was an insured under the terms of the Board's policy of insurance with Continental,[7] Continental should provide both indemnity and a defense for the claims made against him.

Continental then filed a motion for summary judgment on about September 14, 2004, contending that the policy did not provide coverage for Mr. Glendenning's wrongful acts of sexual misconduct and, thus, that it was entitled to judgment as a matter of law. Following a hearing on the matter, the circuit court, by order entered December 9, 2004, granted summary judgment to Continental, finding that Continental had no duty to defend Mr. Glendenning and further concluding that Mr. Glendenning's criminal actions were outside the scope of his employment duties with the Board and, likewise, outside the scope of the "wrongful act" coverage provided by the Continental policy. From this adverse ruling, Mr. Bender appeals to this Court.

6. *See supra* note 1.

7. The "named insured endorsement" of the Continental policy provides that

It is agreed that each of the following is a "named insured"
A. The State of West Virginia;
B. Each West Virginia County Board of Education; and
C. Each West Virginia political subdivision or non profit or for profit non-governmental

## II.

## STANDARD OF REVIEW

The sole issue presented for our resolution by this appeal is whether the circuit court correctly determined that the subject policy of insurance does not provide coverage for Mr. Glendenning's actions and, thus, whether an award of summary judgment in favor of Continental was proper. We previously have held that "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. pt. 3, *Aetna Cas. & Sur. Co. v. Federal Ins. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963). When considering the propriety of such an award, we employ a plenary review. "A circuit court's entry of summary judgment is reviewed *de novo.*" Syl. pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994).

Also at issue in this appeal is whether the subject policy of insurance provides coverage for Mr. Glendenning's actions. In this regard, we have held that "[d]etermination of the proper coverage of an insurance contract when the facts are not in dispute is a question of law." Syl. pt. 1, *Tennant v. Smallwood*, 211 W.Va. 703, 568 S.E.2d 10 (2002). Consequently, "[t]he interpretation of an insurance contract, including the question of whether the contract is ambiguous, is a legal determination that, like a lower court's grant of summary judgment, shall be reviewed *de novo* on appeal." Syl. pt. 2, *Riffe v. Home Finders Assocs., Inc.*, 205 W.Va. 216, 517 S.E.2d 313 (1999). *See also* Syl. pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995) ("Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation

organization covered by certificates of liability insurance on file with the company.
Additional definitions in the policy also extend "insured" status to Mr. Glendenning. *See infra* note 11 and accompanying text. Insofar as the real party in interest in this appeal is the Webster County Board of Education, and not the State of West Virginia, we will refer to the insurance policy at issue as one that was issued to the Board.

of a statute, we apply a *de novo* standard of review.").

Mindful of these standards, we now consider the parties' arguments.

## III.

## DISCUSSION

On appeal to this Court, the appellants assign error to the circuit court's ruling granting summary judgment to Continental based upon its conclusion that the policy of insurance issued by Continental to the Board, and purportedly insuring Mr. Glendenning as an employee thereof, did not provide coverage for the acts of sexual misconduct that the appellants have alleged against Mr. Glendenning. In so ruling, the circuit court determined that because the acts of sexual misconduct with which Mr. Glendenning has been charged are criminal in nature, they are outside the scope of coverage provided by Continental to indemnify the Board against wrongful acts and are not insurable under the governing statutory law. *Citing* W. Va.Code § 29–12A–11(a)(1) (1986) (Repl. Vol.2004).[8] Arguing that this reasoning is erroneous, Mr. Bender contends that the policy provides coverage for Mr. Glendenning's actions under the definition of a "wrongful act". By contrast, Continental agrees with the circuit court's interpretation of the applicable policy language finding that the scope of coverage does not contemplate providing indemnity for an employee's criminal acts.

■ Before reaching the merits of the parties' arguments regarding the extent of coverage provided by the terms of the Continental policy, we first must consider the effect of the West Virginia Governmental Tort Claims and Insurance Reform Act [hereinafter referred to as "the Act"], W. Va.Code § 29–12A–1, *et seq.*, upon the facts of this case. In short, this Act has as its purposes "to limit liability of political subdivisions and provide immunity to political subdivisions in certain instances ...." W. Va.Code § 29–12A–1 (1986) (Repl.Vol.2004). Because the Board is a political subdivision, *see* W. Va.Code § 29–12A–3(c) (1986) (Repl.Vol.2004), the immunity provisions of the Act limit the extent to which the Board and its employees may be held liable for their actions. *See, e.g.,* W. Va.Code § 29–12A–4 (1986) (Repl.Vol.2004); W. Va.Code § 29–12A–5 (1986) (Repl.Vol. 2004).

■ Despite these various limitations of liability, however, when a policy of insurance provides coverage for a political subdivision, the terms of such insurance contract determine the rights and responsibilities of the insurer and its insured(s):

> If a policy or contract of liability insurance covering a political subdivision or its employees is applicable, the terms of the policy govern the rights and obligations of the political subdivision and the insurer with respect to the investigation, settlement, payment and defense of suits against the political subdivision, or its employees, covered by the policy. The insurer may not enter into a settlement for an amount which exceeds the insurance coverage.

W. Va.Code § 29–12A–9(a) (1986) (Repl.Vol. 2004). *But see* W. Va.Code § 29–12A–16(d) (1986) (Repl.Vol.2001) (indicating that political subdivision's purchase of an insurance policy does not automatically waive immunity provided by the Act).[9] In other words, the

---

8. W. Va.Code § 29–12A–11(a)(1) (1986) (Repl. Vol.2004) governs the "[d]efense and indemnification of employees ....":

> Except as otherwise provided in this section, a political subdivision shall provide for the defense of an employee, in any state or federal court, in any civil action or proceeding to recover damages for injury, death, or loss to persons or property allegedly caused by an act or omission of the employee if the act or omission occurred or is alleged to have occurred while the employee was acting in good faith and not manifestly outside the scope of his employment or official responsibilities.

Amounts expended by a political subdivision in the defense of its employees shall be from funds appropriated for this purpose or pursuant to the contractual agreement between the insurer and the political subdivision. The duty to provide for the defense of an employee specified in this subsection does not apply in a civil action or proceeding that is commenced by or on behalf of a political subdivision.

9. After the events at issue in this proceeding, the Legislature amended this Act in 2003. *See* W. Va.Code § 29–12A–16(d) (2003) (Repl.Vol.2004). However, these amendments do not affect our consideration or decision of this appeal.

180

existence of an insurance policy does not per se eliminate the grants of immunity provided by the Act unless the policy fails to include appropriate language and/or exclusions which specifically preserve the Act's immunity provisions. The broad policy of insurance issued by Continental to the Board in the case *sub judice* does not contain any such limiting language and/or exclusions and, thus, its terms define the scope and extent of the Board's liability as well as that of its employee, Mr. Glendenning.

▆ Turning now to the applicable Continental insurance policy in question, we first must ascertain whether Mr. Glendenning was, in fact, an insured under the Board's policy and then, if he was, whether the policy provided coverage for the acts with which he has been charged. We previously have held that "[l]anguage in an insurance policy should be given its plain, ordinary meaning." Syl. pt. 1, *Soliva v. Shand, Morahan & Co., Inc.,* 176 W.Va. 430, 345 S.E.2d 33 (1986), *abrogated on other grounds by' National Mut. Ins. Co. v. McMahon & Sons, Inc.,* 177 W.Va. 734, 356 S.E.2d 488 (1987). Thus, "[w]here provisions in an insurance policy are plain and unambiguous and where such provisions are not contrary to a statute, regulation, or public policy, the provisions will be applied and not construed." Syl. pt. 2, *Shamblin v. Nationwide Mut. Ins. Co.,* 175 W.Va. 337, 332 S.E.2d 639 (1985). *Accord* Syl., *Keffer v. Prudential Ins. Co. of America,* 153 W.Va. 813, 172 S.E.2d 714 (1970) ("Where the provisions of an insurance policy contract are clear and unambiguous they are not subject to judicial construction or interpretation, but full effect will be given to the plain meaning intended.").

▆ With specific regard to the parties involved in the instant appeal, *i.e.,* a political subdivision and its employee who are both protected by the terms of the West Virginia Governmental Tort Claims Act, we have observed that "[t]he general rule of construction in governmental tort legislation cases favors liability, not immunity. Unless the legislature has clearly provided for immunity under the circumstances, the general com-

mon-law goal of compensating injured parties for damages ... must prevail." Syl. pt. 2, in part, *Marlin v. Bill Rich Constr., Inc.,* 198 W.Va. 635, 482 S.E.2d 620 (1996). Therefore,

[i]f the terms of the applicable insurance coverage and contractual exceptions thereto acquired under W. Va.Code § 29–12–5 *expressly* grant the State greater or lesser immunities or defenses than those found in the case law, the insurance contract should be applied according to its terms and the parties to any suit should have the benefit of the terms of the insurance contract.

Syl. pt. 5, *Parkulo v. West Virginia Bd. of Probation & Parole,* 199 W.Va. 161, 483 S.E.2d 507 (1996) (emphasis in original).

▆ Considering the precise language employed in the subject contract of insurance, we find that the policy language clearly includes Mr. Glendenning as a named insured. In this regard, the named insured endorsement plainly includes within its ambit "each West Virginia County Board of Education[.]" [10] Thereafter, the policy language specifically defines an "insured" to include "the 'named insured' and those persons who were[,] are now[,] or shall be ... employees of the 'named insured.'" [11] Insofar as the parties do not dispute that Mr. Glendenning was an employee of the Board at all times relevant to Mr. Bender's claims against him, we conclude that Mr. Glendenning was, in fact, a named insured under the Board's Continental policy.

▆ Next, we must determine whether the terms of the Board's policy provide coverage to Mr. Glendenning for the various acts of sexual misconduct with which he has been charged. The parties do not dispute that the relevant policy language is the insurance contract's definition of and statement of coverage for a "wrongful act". In this regard, a

"[w]rongful act" shall mean any actual or alleged error or misstatement or act or omission or neglect or breach of duty including malfeasance[,] misfeasance, and non-feasance by the insureds in the dis-

---

10. *See* note 7, *supra.*

11. *See supra* note 3.

charge of their duties with the "named insured," individually or collectively, or *"any other matter claimed against them solely by reason of their being or having been insureds."*

(Emphasis added). Given the broad nature of this language, we find that coverage clearly exists under this definition of a wrongful act. Mr. Bender has alleged that, while he was a student at an elementary school operated by the Webster County Board of Education, his teacher, Mr. Glendenning, who was employed by that same Board, committed various acts of sexual misconduct against him. In short, Mr. Bender has made his claims against his teacher, Mr. Glendenning, "solely by reason of [Mr. Glendenning's] being or having been [an] insured[ ]," which basis for recovery is plainly within the policy's definition of a wrongful act for which coverage is provided.

Alternatively, coverage for Mr. Glendenning's acts of sexual misconduct is provided by that part of the wrongful act's definition that indemnifies its insureds against claims of "malfeasance". Insofar as the policy, itself, does not explain the meaning of the term "malfeasance," we must resort to the word's "plain, ordinary meaning." Syl. pt. 1, in part, *Soliva v. Shand, Morahan & Co., Inc.,* 176 W.Va. 430, 345 S.E.2d 33. "Malfeasance" is defined as "[a] wrongful or unlawful act[.]" Black's Law Dictionary 968 (7th ed.1999). *Accord* II Abbott's Law Dictionary 71 (1879) (explaining "malfeasance" as "[t]he commission of some act which is positively unlawful"); Ballentine's Law Dictionary 767 (3d ed.1969) (defining "malfeasance" as "[t]he doing of an act which is positively unlawful or wrong" (citation omitted)). *Cf.* 2 Bouvier's Law Dictionary Unabridged 2067 (8th ed.1984) (construing "malfeasance" as "[t]he unjust performance of some act which the party had no right, or which he had contracted not, to do"). Thus, given that the acts of sexual misconduct levied against Mr. Glendenning were criminal in nature, it goes without saying that they constituted "wrongful or unlawful act[s]," which satisfy the definition of malfeasance for which coverage is provided by the Board's Continental policy. Accordingly, the Board's insurance contract not only identifies Mr. Glendenning as an insured

but also specifically provides coverage for the claims Mr. Bender has asserted against him, both by virtue of Mr. Glendenning's status as an employee of the Board and by reason of the criminal nature of his misconduct against Mr. Bender.

 Finally, where, as here, a policy of insurance clearly provides coverage for a claim of loss, liability nevertheless may be avoided where there exists an exclusion to limit the scope or extent of such coverage. With specific regard to claims alleging sexual misconduct, we have held that

> [t]here is neither a duty to defend an insured in an action for, nor a duty to pay for, damages allegedly caused by the sexual misconduct of an insured, when the liability insurance policy contains a so-called "intentional injury" exclusion. In such a case the intent of an insured to cause some injury will be inferred as a matter of law.

Syl., *Horace Mann Ins. Co. v. Leeber,* 180 W.Va. 375, 376 S.E.2d 581 (1988). However, any type of exclusion, whether it limits coverage for intentional injuries, criminal acts, or other types of misconduct, must be stated with such clarity and specificity so as to place an insured on notice as to its existence in the subject policy of insurance. In other words,

> [a]n insurer wishing to avoid liability on a policy purporting to give general or comprehensive coverage must make exclusionary clauses conspicuous, plain, and clear, placing them in such a fashion as to make obvious their relationship to other policy terms, and must bring such provisions to the attention of the insured.

Syl. pt. 10, *National Mut. Ins. Co. v. McMahon & Sons, Inc.,* 177 W.Va. 734, 356 S.E.2d 488 (1987), *abrogated on other grounds by Potesta v. United States Fid. & Guar. Co.,* 202 W.Va. 308, 504 S.E.2d 135 (1998).

 Reviewing the Continental policy at issue in this case, we are able to identify only one provision that attempts to exclude coverage in the case *sub judice.* Endorsement Number 6 of the policy states,

> It is agreed that:
> A. The terms of the policy which are in conflict with the statutes of the state of West Virginia wherein certain provisions and coverages included under this policy

are not permitted are hereby amended to cover only those provisions and coverages as apply and conform to such statutes. While this clause purportedly seeks to preserve the immunities granted to political subdivisions and its employees by the West Virginia Governmental Tort Claims Act, we do not find that it is sufficiently "conspicuous, plain, and clear" so as to clearly identify the precise limitation of liability it is intended to impart. Syl. pt. 10, in part, *National Mut. Ins. Co. v. McMahon & Sons, Inc.*, 177 W.Va. 734, 356 S.E.2d 488. *See also* Syl. pt. 5, *id.* ("Where the policy language involved is exclusionary, it will be strictly construed against the insurer in order that the purpose of providing indemnity not be defeated."). Because there are no other provisions in the Continental policy which seek to exclude from coverage an insured's criminal or intentional acts, we find that coverage existed under the subject policy for Mr. Bender's claims against Mr. Glendenning. Accordingly, we reverse the circuit court's ruling finding that the Board's policy did not provide such coverage to Mr. Glendenning and the court's corresponding award of summary judgment to Continental. We further remand this matter for further proceedings consistent with this opinion.

## IV.

## CONCLUSION

For the foregoing reasons, the December 9, 2004, order of the Circuit Court of Webster County is hereby reversed, and this case is remanded for further proceedings consistent with this opinion.

Reversed and Remanded.

BENJAMIN, Justice, dissenting.
(Filed May 16, 2006)

While I understand my colleagues' desire to provide the potential for available funds to compensate the victims of Donald Glendenning's horrific abuse, I must respectfully dissent from the majority opinion in this matter because, in my opinion, the governmental insurance policy at issue herein simply does not provide coverage for a teacher's criminal acts of sexually abusing his students.

The insurance policy before this Court herein was issued to the State of West Virginia. It covers all county boards of education, including the Webster County Board of Education, as a named insureds.[1] The policy provides various forms of coverage including comprehensive general liability coverage, professional liability coverage, personal injury liability coverage, stop gap liability coverage and wrongful act liability coverage. The only coverage part at issue herein is the wrongful act liability coverage.[2]

### A.

*Governmental Immunity, the West Virginia Governmental Tort Claims and Insurance Reform Act and State Insurance*

The question of whether insurance coverage exists for a claim against a governmental

---

1. There is no dispute that coverage exists under this policy for the students' claims asserted against the Webster County Board of Education arising from the Board's employment and supervision of Mr. Glendenning.

2. The policy in question on this appeal was issued for the policy period of July 1, 1994 to July 1, 1995. It is apparently undisputed that the sexual abuse at issue is alleged to have occurred during the 1994–1995 school year which would include the policy period. However, the wrongful act liability coverage part contains the following insuring clause:

 The Company agrees with the insureds that *if, during the policy period, any claim or claims first made* against the insureds, individually or collectively, for a wrongful act, the company will pay on behalf of, in accordance with the terms of this coverage part, the insureds, or any of them, their executors, administrators or assignees for all loss which the said insureds, or any of them, shall become legally obligated to pay damages.

 (Emphasis added). While the acts of abuse at issue are asserted to have occurred during the policy period, the claims herein were not made until the year 2001. Therefore, I question whether coverage under the policy presented would be triggered. When questioned at oral argument regarding whether the claims made coverage at issue was triggered when the occurrence happened during the policy period but the claim was not made until nearly five years after expiration of the policy period, counsel advised that coverage under this policy was triggered due to a novation agreement.

 This coverage part defines insured to include a named insured's employees. Thus, teachers employed by the Webster County Board of Education, such as Glendenning, may be included with the coverage part's definition of insured.

employee must necessarily begin with a determination as to whether a constitutional or statutory immunity applies to the claim. If there is an applicable immunity, insurance coverage cannot exist because the insurance coverage may only be purchased to cover those claims for which there is no constitutional or statutory immunity. As such, an analysis of whether coverage exists under the State's insurance policy for the claims asserted against Glendenning must begin with a discussion of constitutional and statutory immunities.

Until fairly recently in our State's history, the general rule was that constitutional immunity barred most claims against governmental entities. Pursuant to Article VI, Section 35 of the *West Virginia Constitution,*

> The State of West Virginia shall never be made a defendant in any court of law or equity, except the State of West Virginia, including any subdivision thereof, or any municipality therein, or any officer, agent, or employee thereof, may be made a defendant in any garnishment or attachment proceeding, as a garnishee or suggestee.

Deeming absolute immunity for governmental entities to be unduly harsh, this Court created exceptions to the same.[3] Ultimately, in 1974, this Court summarily concluded that the immunity set forth in Article 35, Section 6 does not extend to municipalities, rejecting the argument that local government is a "branch" of the State. Syl. Pt. 4, *Higginbotham v. City of Charleston,* 157 W.Va. 724, 733, 204 S.E.2d 1, 7 (1974).

One year later, in 1975, then-Chief Justice Haden conducted an extensive analysis of the history of common-law governmental immunity and its intricate governmental-proprietary function exceptions, particularly as applied to municipal entities in *Long v. City of Weirton,* 158 W.Va. 741, 767–86, 214 S.E.2d 832, 850–60 (1975). Noting the history of common-law municipal governmental immunity did not support a continued recognition of the same, the Court abolished it in *Long.* Syl. Pts. 9 & 10, *Long.* However, in so

doing, Chief Justice Haden encouraged legislative action regarding the scope of local governmental immunity stating:

> Although, indeed, it would seem preferential for the Legislature to speak comprehensively, we do not wish to perpetuate bad law of judicial origin pending the fortuity of action by the Legislature.

*Long,* 158 W.Va. at 783, 214 S.E.2d at 859. Prior to the Legislature accepting Chief Justice Haden's invitation, this Court went on to abolish common law governmental immunity as it applied to county commissions and county boards of education. *See,* Syl. Pt. 2, *Gooden v. County Commission,* 171 W.Va. 130, 298 S.E.2d 103 (1982) (county commissions); *Ohio Valley Contractors v. Board of Education,* 170 W.Va. 240, 293 S.E.2d 437 (1982) (county boards of education). The Legislature finally accepted Chief Justice Haden's invitation in 1986, when it enacted the West Virginia Governmental Tort Claims and Insurance Reform Act, W. Va.Code §§ 29–12A–1, *et. seq.* (1986) (hereinafter, the "Act").

In *Randall v. Fairmont City Police Department,* 186 W.Va. 336, 412 S.E.2d 737(1991), Justice McHugh, writing for the Court, acknowledged this Court's prior abolition of common-law governmental immunity and the Legislature's reaction thereto in enacting the Act. Justice McHugh eloquently described the Act as follows:

> "Its purposes are to *limit* [tort] liability of political subdivisions *and* [to] provide [tort] *immunity* to political subdivisions in *certain* instances *and* to *regulate* the costs and coverage of *insurance* available to political subdivisions for such liability." W. Va.Code, 29–12A–1 [1986] (emphasis added). The basic structure of the Act is as follows.

Under the Act a political subdivision is stated to be immune generally from liability for damages in a civil action brought for death, injury or loss to persons or property allegedly caused by any act or omission of the political subdivision. *W. Va.Code,* 29–12A–4(b)(1) [1986]. The Act lists seven-

---

**3.** In *Pittsburgh Elevator Co. v. West Virginia Board of Regents,* 172 W.Va. 743, 749–755, 310 S.E.2d 675, 681–687 (1983), this Court discussed the history of judicial interpretation of constitu-

tional immunity, including its intricate exceptions, procedural methods to avoid immunity and its sometimes contradictory holdings applying the same.

teen specific types of acts or omissions covered by the tort immunity available under the Act to a political subdivision. *W. Va.Code*, 29–12A–5(a)(1)–(17) [1986]. . . .

The Act also immunizes an employee of a political subdivision from tort liability, unless his or her acts or omissions were manifestly outside the scope of employment or official responsibilities; or unless the employee's acts or omissions were with malicious purpose, in bad faith or in a wanton or reckless manner; or unless any statute expressly imposes liability upon the employee. *W. Va.Code*, 29–12A–5(b)(1)–(3) [1986].

On the other hand, the Act recognizes the tort liability of a political subdivision for acts or omissions in five fairly broad situations, W. Va.Code, 29–12A–4(c)(1)–(5) [1986], including liability in tort for damages "caused by the negligent performance of acts by their [political subdivisions'] employees while acting within the scope of employment [,]" *W. Va.Code*, 29–12A–4(c)(2) [1986]. For these situations where liability attaches, the Act imposes a $500,000 limit of liability for the noneconomic loss of any one person, *W. Va.Code*, 29–12A–7(b) [1986], and disallows punitive damages, *W. Va.Code*, 29–12A–7(a) [1986]. The Act explicitly provides that "[t]he purchase of liability insurance ... by a political subdivision does not constitute a waiver of any immunity it may have pursuant to this article or [of] any defense of the political subdivision or its employees." *W. Va. Code*, 29–12A–16(d) [1986]. The liability insurance could be purchased by a political subdivision "with respect to its potential liability and that of its employees" under the Act. *W. Va.Code*, 29–12A–16(a) [1986]. Finally, the Act contains provisions regulating the costs and coverage of liability insurance available to political subdivisions. *W. Va.Code*, 29–12A–17 [1986].

The history in West Virginia of the qualified immunity, from tort liability, available to municipalities and certain other political subdivisions of the state is consistent with the typical pattern in most of the other jurisdictions: a broad, often total, abrogation by the judiciary of the state common-law local governmental tort immunity, followed soon thereafter by the enactment of governmental tort claims legislation, typically providing in substance for a broad reinstatement of local governmental immunity from tort liability.

*Randall*, 186 W.Va. at 341–2, 412 S.E.2d at 742–3 (emphasis in original, footnotes omitted).

As recognized by this Court in Justice McHugh's description of the Act, insurance may be purchased to cover liability for those acts where immunity has not been retained. The Act's immunity provisions and the scope of insurance which may be obtained are thereby interrelated. The Act explicitly provides that:

The purchase of liability insurance, or the establishment and maintenance of a self-insurance program, by a political subdivisions *does not constitute a waiver of any immunity it may have pursuant to this article* or any defense of the political subdivision or its employees.

W. Va.Code § 29–12A–16 (d) (2003) (emphasis added). While the majority acknowledges (albeit in a *"but see"* parenthetical) the presence of this statutory provision, I must disagree with its description of the same. The majority states this provision provides "purchase of an insurance policy does not *automatically* waive immunity provided by the Act." (Emphasis added). Contrary to this suggestion by the majority, the plain language of the statute unambiguously provides that the terms of the insurance policy *does not* operate to *waive* statutory immunity. I find no equivocation whatsoever in the language chosen by the Legislature. The statute does not provide that the policy must specifically preserve statutory immunity as the majority deems is required. Similarly, W. Va.Code § 29–12–5(a)(4) (2004)[4], which authorizes the State Board of Risk and Insurance Management to procure insurance on behalf of the state and its political subdivi-

4. Although various amendments have been made to W. Va.Code § 29–12–5 subsequent to the purchase of the policy at issue herein, W. Va.Code § 29–12–5(a)(4) was not affected.

sions [5], unambiguously states "[t]hat nothing herein shall bar the insurer of political subdivisions from relying upon any *statutory immunity* granted such political subdivisions against claims or suits" and does not require a specific preservation of the same in the policy itself. (Emphasis added).

Our statutory law governs both who and what may be covered by a governmental insurance policy. The policy should not be read independent of our governing statutes as I believe the majority has done in this instance. The policy at issue herein contains three separate provisions which, in my opinion, recognize this interrelationship. These include policy Endorsement Number 6,[6] Wrongful Act Liability Coverage Part Section VI. D [7] and Wrongful Act Liability Coverage Exclusion 4.[8] The majority acknowledges only Endorsement Number 6, noting that it purports to preserve the provisions of the Act but finding it is not "sufficiently 'conspicuous, plain, and clear' " to be enforced. I disagree with this conclusion. Here, we are dealing with a governmental insurance policy which was purchased by virtue of statutory authority to cover claims for which the State has not waived or preserved immunity on its behalf or on behalf of its political subdivisions. It is my opinion that the policy must be read in light of the applicable statutes, not independent of them.

The majority avoids discussion of applicable statutes by citing to Syllabus Point 5 of this Court's opinion in *Parkulo v. West Virginia Bd. of Probation & Parole*, 199 W.Va. 161, 483 S.E.2d 507 (1996). According to Syllabus Point 5, the terms of an insurance contract control where they grant greater or lesser immunities than those found in *case law*.[9] However, the issue presented to this Court did not involve defenses and immunities found in *case law*. The issue herein involves the application of *statutory law*, not *case law*. In *Parkulo*, we expressly recognized that the *"Legislature may direct such limitation or expansion of the insurance coverages and exceptions applicable* to cases brought under W. Va.Code § 29–12–5, as, in its wisdom, may be appropriate." *Parkulo*, 199 W.Va. at 175, 483 S.E.2d at 521. As we recognized in *Parkulo*, legislative direction— such as that found in our statutes—trumps arguably contrary provisions found in the insurance policy at issue. The majority decision now brings this accepted principle into question. To rely upon precedent which states that contrary policy provisions override common-law immunities in order that applicable statutes may be ignored is, in my opinion, not only contrary to our prior jurisprudence, but is also inappropriate in view of the statutory law applicable herein. To my knowledge, we have never held that the

5. The term "political subdivision" includes county boards of education for purposes of obtaining liability insurance and for the Act. W. Va.Code § 29–12–5(b)(1)(A) (2004); W. Va.Code § 29–12A–3(c) (1986).

6. Endorsement Number 6 provides:

It is agreed that:
A. The terms of the policy which are in conflict with the Statutes of the State of West Virginia wherein certain provisions and coverages included under this policy are not permitted are hereby amended to cover only those provisions and coverages as apply and conform to such statutes.

7. Section VI. D states:

Conformity Clause
Terms of this Coverage Part which are in conflict with the statutes of those states wherein certain provisions and coverages included under this coverage part are not permitted are hereby amended to cover only those provisions and coverages as apply and conform to such statutes

8. Wrongful Action Liability Coverage Part IV. Exclusions provides:

The Company shall not be liable to make any payment in connection with any claim made against the insureds:
4. Which is insured on a primary basis by another valid policy or policies (including the policy to which this coverage part is attached) *or which shall be deemed uninsurable under the law pursuant to which this endorsement shall be construed.*
(Emphasis added).

9. Syllabus Point 5 states, in its entirety:

If the terms of the applicable insurance coverage and contractual exceptions thereto acquired under W. Va.Code § 29–12–5 *expressly* grant the State greater or lesser immunities or defenses than those found in the case law, the insurance contract should be applied according to its terms and the parties to any suit should have the benefit of the terms of the insurance contract.
*Parkulo, supra.* (Emphasis in original).

terms of an insurance policy may negate statutory law.

Examination of our statutory law reveals that coverage does not exist under the State's insurance policy for the claims asserted against Glendenning. Glendenning was employed, as a teacher by the Webster County Board of Education when he, by his admission, sexually abused some of his students. Pursuant to W. Va.Code § 29–12–5a (1986), in effect during the times at issue herein, the State Board of Risk and Insurance Management was required to provide:

> appropriate professional or other liability insurance for all county boards of education [and] teachers ... Said insurance shall cover any claim, demand, action, suit or judgment by reason of *alleged negligence or other acts* resulting in bodily injury or property damages ... *if, at the time of the alleged injury, the teacher, ... was acting in the discharge of his duties, within the scope of his office, position or employment, under the direction of the board of education* ... The [teacher] shall be defended by the county board or an insurer *unless the act or omission shall not have been within the coarse or scope of employment or official responsibility or was motivated by malicious or criminal intent.*[10]

(Emphasis added). Likewise, the Act, in W. Va.Code § 29–12A–11 (a)(1) (1986), requires a political subdivision to provide for the defense of an employee, such as Glendenning, relating to claims for injuries "allegedly caused by an act or omission of the employee *if* the act or omission is *alleged to have occurred while* the employee was *acting in good faith and not manifestly outside the scope of his employment or official responsibilities.*" (Emphasis added). One cannot seriously question that a teacher who engages in criminal misconduct of the kind admitted to by Glendenning to herein has neither acted in good faith nor within the scope of his employment or responsibilities. These were purposeful acts. These were criminal acts.

The Act similarly immunizes a political subdivision employee from personal liability *unless* his acts or omissions were (1) "manifestly outside the scope of employment or official responsibilities" or (2) "with malicious purpose, in bad faith, or in a wanton or reckless manner[.]" W. Va.Code § 29–12A–5 (b)(1)-(2) (1986).[11] The Act also authorizes liability to be imposed upon the political subdivision for the acts of its employees where the injury is caused "by the *negligent* performance of acts by their employees *while acting within the scope of employment*" or "by the *negligence* of their employees and that occurs within or on the grounds of buildings that are used by such political subdivisions." W. Va.Code § 29–12A–4 (c)(2) & (4) (1986).

Reading each of the above statutes *in para materia* leads, in my opinion, to the inescapable conclusion that a political subdivision employee, such as Mr. Glendenning, may only be provided coverage under the State's insurance policy in limited instances. Our statutory law authorizes the purchase of insurance to correspond to liabilities assumed and immunities waived by statute. If the employee is acting in good faith, not manifestly outside the scope of his employment or official responsibilities, and without malicious or criminal intent, he is entitled to a defense and is immune from personal liability. *See,* W. Va.Code §§ 29–12–5a; 29–12A–11 (a)(1) and 29–12A–5 (b). While granting the employee this immunity, the Legislature simultaneous imposed liability upon the political subdivision employer for its employee's negligent acts and required the employer to provide a defense to the employee. *See,* W. Va.Code §§ 29–12–5a; 29–12A–4 (c)(2) & (4). Likewise, the Legislature authorized the purchase of liability insurance to provide a de-

---

10. This statute was amended in 2005. The amendments essentially broke down the statute into subsections and added language, in subsection (a), that insurance is not required to be provided for every activity or responsibility of the board and teachers. The provisions cited in the text above remain in the amended statute.

11. An employee's immunity is also waived where another statute expressly imposes liability upon the employee. W. Va.Code § 29–12A–5(b)(3).

fense and indemnification in these limited circumstances. W. Va.Code § 29–12–5a.

The Legislature has specifically *prohibited* the purchase of insurance to defend and indemnify a teacher when the teacher is acting outside the course or scope of his employment or official responsibility or when the acts or omissions are motivated by malicious or criminal intent. W. Va.Code § 29–12–5a. In the instant matter, Glendenning, a teacher, pled guilty to criminal charges arising from the sexual abuse of his student, Mr. Bender, and was criminally sentenced for the same. He also admitted, in the criminal proceedings, to sexually abusing Mr. Strum, Mr. Gregory, and Mr. Brooks. At a minimum, therefore, because the conduct which forms the basis of the claims asserted herein was criminal in nature, no authorization to purchase insurance covering liability arising from his misconduct ever existed. Thus, the claims asserted against Glendenning cannot, as a matter of law, fall within the coverage of the State's insurance policy.[12]

### B.

### *The Majority's Interpretation of the Insurance Policy*

Although I do not believe, based upon the above analysis, that coverage can exist under the policy for the claims asserted against Mr. Glendenning, I feel compelled to also address the majority's interpretation of the policy provisions. The majority primarily relies upon its interpretation of the Wrongful Act Liability Coverage's definition of "wrongful act"[13] and the inclusion of the term "malfeasance" in the same to support its holding in this matter. Surprisingly, the majority omits mention in its analysis to this Court's recent opinion in *Moore v. CNA Insurance Company, d/b/a Continental Casualty Company,* 215 W.Va. 286, 599 S.E.2d 709 (2004), which involved the precise wrongful act definition at issue herein. In *Moore,* this Court found that former-Governor Moore's criminal guilty pleas precluded both a duty to defend and a duty to indemnify him for claims asserted in a civil action relating to the conduct forming the basis of the guilty pleas. The same circumstance is presented here. Coverage is sought for claims arising from the same misconduct which form the basis of Mr. Glendenning's criminal guilty pleas. In *Moore,* this Court found that the criminal guilty pleas were sufficient to preclude both a duty to defend and a duty to indemnify under the same wrongful act definition contained in the State's insurance policy. The majority herein now reaches the exact opposite conclusion without explanation and without reference to *Moore.*

I am also troubled by the breadth of the majority's holding. The majority emphasizes the phrase "and any other matter claimed against them solely by reason of their being or having been insureds" in finding coverage existed under the Wrongful Act Liability provisions of the policy. By this, it appears that the majority has found that so long as a claim is asserted against a governmental employee which has some relationship to that employee's employment, coverage exists. The potential for frivolous actions seeking to use the State's insurance policy as a deep pocket for recoveries is enhanced by the majority's holding. For example, suppose an off-duty State Trooper was cleaning a personal gun when it accidentally discharged, injuring a visiting neighbor. The neighbor files suit, alleging that because of his training as a State Trooper, the State Trooper possessed heightened experience and training in handling a gun and as such, should have been able to avoid the accidental discharge. This allegation would not have been made but for his status as a State Trooper. Under the majority's analysis, coverage would apparent-

---

12. To be clear, I am not expressing an opinion on whether there would be a duty to defend a teacher accused in a civil action of sexual abusing a student prior to an admission of guilt by the teacher. That situation is not currently before the Court in this matter.

13. The coverage part defines by stating:

"[w]rongful act" shall mean any actual or alleged error or misstatement or act or omission or neglect or breach of duty including malfeasance[,] misfeasance, and non-feasance by the insureds in the discharge of their duties with the "named insured," individually or collectively, or any other matter claimed against them solely by reason of their being or having been insureds.

ly exist under the State Insurance policy for this claim as it is made solely by reason of his being an insured State Trooper. I fear the majority's broad holding may indeed abolish all statutory coverage limitations and all otherwise valid policy exclusions. Under the majority's analysis, it appears that to obtain coverage under the State's insurance policy, all one needs to do is to creatively plead that the defendant for whom coverage is sought is a government employee and there is some relationship, however tenuous, between the claim and the defendant's employment. Statutory limitations providing that coverage may only be provided for acts within the scope of employment which were done without malicious or criminal intent have seemingly been invalidated by implication in the majority's *per curium* opinion.

Finally, I am unpersuaded by the majority's reasoning that to find coverage that does not exist for the claims asserted against Glendenning in this matter would require the Court to read an intentional acts exclusion into the policy. As discussed above, the Legislature has simply not authorized the purchase of insurance to cover intentional acts. The intentional act exclusion the majority seeks to avoid reading into the policy is a statutory prohibition, not a policy exclusion. There simply is no need for a policy to exclude that which is already excluded by statute. Furthermore, there is a strong public policy against the state insuring criminal misconduct. The criminal, not the citizens of West Virginia whose tax dollars provide the coverage found by the majority, should pay for the consequences of the criminal's conduct.

For the reasons stated above, I respectfully dissent from the majority opinion issued herein.

MAYNARD, Justice, dissenting.

(Filed June 22, 2006)

I would have affirmed the circuit court's summary judgment order in favor of Continental Casualty Company because I do not believe that the Legislature intended for county boards of education to pay damages arising from the sex crimes of teachers.

The enabling statute under which the school board below was authorized to purchase liability insurance, W.Va.Code § 29–12–5a(b) (2005), states that insurance provided by the Board of Risk and Insurance Management shall cover claims "if, at the time of the alleged injury, the teacher ... was acting in the discharge of his or her duties, within the scope of his or her office[.]" Also, the Governmental Tort Claims and Insurance Reform Act, W.Va.Code §§ 29–12A–1, *et seq.*, makes it abundantly clear that school boards are liable only for acts of their employees performed in the scope of their employment, and not for acts that are malicious, in bad faith, or otherwise outside the scope of employment. Sexual assault is not a negligent act, and it is not within the scope of a teacher's employment.

The majority, however, reads W.Va.Code § 29–12A–9(a) to indicate that when a policy of insurance provides coverage for a political subdivision, the terms of such insurance contract determine the rights and responsibilities of the insurer and its insureds. I believe that this interpretation of W.Va.Code § 29–12A–9(a) is wrong. Significantly, it conflicts with W.Va.Code § 29–12A–16(d) (2003) which provides that "[t]he purchase of liability insurance ... by a political subdivision does not constitute a waiver of any immunity it may have pursuant to [the Tort Claims Act] or any defense of the political subdivision or its employees." Further, I do not believe that we should read W.Va.Code § 29–12A–9(a) in a manner that effectively voids all other provisions of the Tort Claims Act because to do so violates this Court's rules of construction.

Accordingly, for the reasons stated above, I dissent.

STARCHER, J., concurring.

(Filed July 11, 2006)

I concur with the majority's conclusion that the liability insurance policy bought by the Webster County Board of Education provided coverage in this case. I write separately to emphasize the reasons for the majority's decision.

First, the majority opinion was based on a simple reading of the insurance policy. The majority's conclusion was not based on some pie-in-the-sky "desire to provide ... funds to compensate the victims of Donald Glendenning's horrific abuse" as one of my dissenting colleagues suggests. My dissenting colleagues refuse to acknowledge what is obvious: this policy was sloppily and broadly written by the insurance company to provide coverage for, well, just about everything bad that a school employee could do. The opinion therefore reflects the majority's desire to give some effect to the King's English. When a school board buys an insurance policy that explicitly covers a "wrongful act" and "malfeasance" by a school employee, this Court shouldn't be in the business of ignoring that policy language as the dissenters would prefer.

Second, the position urged by the dissenters would have the effect of giving the insurance company a windfall at the expense of the school board and the taxpayers of this State. The policy clearly covers the perverted acts of malfeasance inflicted by Donald Glendenning, and the school board and taxpayers paid premiums for that coverage. The dissenters would let the insurance company pocket those premiums, at the expense of the school board, the taxpayers, and—most importantly—Mr. Glendenning's victims.

Third, the Governmental Tort Claims and Insurance Reform Act was adopted by the Legislature to "limit liability of political subdivisions and provide immunity to political subdivisions in certain instances." *W.Va. Code*, 29–12A–1 [1986]. The Act was not designed to limit the contractual liability of insurance companies, or to provide immunity to insurance companies that provide insurance to political subdivisions. The immunity belongs to the political subdivision, not the insurance company. Therefore, an insurance company cannot say it sold coverage to a political subdivision for a particular risk for which the political subdivision is immune, and when a loss later occurs, announce to the political subdivision that there is no coverage under the Act—all the while, pocketing the premiums paid for the coverage by the political subdivision.

Fourth, my dissenting colleagues assert that the Act can only be read to establish the *maximum* amount of coverage that insurance companies must provide to a political subdivision. But the majority's opinion makes clear that the Act can be read another way. The Act can also be read—like most insurance statutes are—to delineate the *minimum* amount of coverage that insurance companies must legally provide. Viewed this way, the Act says that the *minimum* coverage a company must provide to a school board is liability coverage against "damages for injury, death, or loss to persons or property allegedly caused by an act or omission of the employee if the act or omission occurred or is alleged to have occurred while the employee was acting in good faith and not manifestly outside the scope of his employment or official responsibilities." *W.Va.Code*, 29–12A–11(a)(1) [1986]. Likewise, *W.Va. Code*, 29–12–5a [1986] [1] specifies the *minimum* coverage that the State Board of Risk and Insurance Management "shall" purchase for school boards and school employees. There is nothing in the language of either statute preventing an insurance company from selling, and a school board from buying,

---

1. 29–12–5a [1986] provides,

In accordance with the provisions of this article, the state board of risk and insurance management shall provide appropriate professional or other liability insurance for all county boards of education, [and] teachers....

Such insurance coverage shall be in an amount to be determined by the state board of risk and insurance management, but in no event less than one million dollars for each occurrence.....

The insurance policy shall include comprehensive coverage, personal injury coverage, malpractice coverage, corporal punishment coverage, legal liability coverage as well as a provision for the payment of the cost of attorney's fees in connection with any claim, demand, action, suit or judgment arising from such alleged negligence or other act resulting in bodily injury under the conditions specified in this section.

The county superintendent and other school personnel shall be defended by the county board or an insurer in the case of suit, unless the act or omission shall not have been within the course or scope of employment or official responsibility or was motivated by malicious or criminal intent. This statute was modified in 2005, but no changes were made affecting this case.

coverage that exceeds these statutory minimums. Applied to this case, as the majority opinion holds, there is nothing preventing a school board from purchasing insurance against wrongful acts or acts of malfeasance.

Fifth, the position advocated by my dissenting colleagues is wholly contrary to public policy. School boards unfortunately routinely incur stupendous financial losses as a result of sexual misconduct by teachers and other school employees. The risk that a school employee will engage in sexual misconduct with a student is known, definable and measurable to the insurance industry. Accordingly, if the insurance industry chooses to sell liability coverage for that risk, then good public policy is that school boards should be permitted to minimize their risk of financial loss by buying that coverage. My dissenting colleagues instead appear to suggest that either school boards and taxpayers should bear the financial burden of a rogue teacher's conduct; or the victims of the teacher's conduct should bear their losses without any remedy. The law abhors allowing a wrong without a remedy.

Finally, the Tort Claims and Insurance Reform Act is, in a word, a "snafu." The various provisions of the Act are vague, convoluted and conflicting, and (as this case shows) are fertile ground for clever lawyers to breed wasteful litigation. Take, for instance, the lawyers in this case. The plaintiffs filed their lawsuit in 2001 seeking recompense for their injuries inflicted by Mr. Glendenning and, to a far lesser degree, the Webster County Board of Education. The parties want some closure. Yet here we are, five years later with the lawyers dickering over the meaning of the Tort Claims and Insurance Reform Act. All the while the insurance company is pocketing interest on the premiums paid by the school board.

The majority's opinion was a proper reading of the insurance policy purchased by the Webster County Board of Education. That policy was purchased for expensive premiums, and the language of the policy fairly protected the school board and its employees against liability—even from "wrongful acts" and "malfeasance." To hold otherwise, as

my dissenting colleagues wish, would be manna from heaven for insurance companies.

I therefore respectfully concur.